## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

ZYMOGENETICS, INC., a Washington )
Corporation, )
　　　　　　　　　　　　　　　　　　　 )
　　　　　　　　　Plaintiff, )
　　　　　　　　　　　　　　　　　　　 )　　C.A. No. 06-500-SLR
　　　　　v. )
　　　　　　　　　　　　　　　　　　　 )　　PUBLIC VERSION
BRISTOL-MYERS SQUIBB CO., )
a Delaware Corporation, and DOES 1 )
through 100, )
　　　　　　　　　　　　　　　　　　　 )
　　　　　　　　　Defendants. )
　　　　　　　　　　　　　　　　　　　 )

**DECLARATION OF MEGHAN WHARTON IN SUPPORT OF PLAINTIFF
ZYMOGENETICS, INC.'S OPPOSITION TO DEFENDANT BRISTOL-MYERS
SQUIBB COMPANY'S MOTION FOR BIFURCATION OF DAMAGES AND
RENEWED MOTION FOR BIFURCATION OF WILLFUL INFRINGEMENT**

OF COUNSEL:

Paul J. Andre
Lisa Kobialka
KING & SPALDING LLP
1000 Bridge Parkway
Suite 1000
Redwood City, CA  94065
(650) 590-0700

Dated:  May 23, 2008
Public Version:  May 30, 2008

Philip A. Rovner (#3215)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
P. O. Box 951
Wilmington, DE  19899
(302) 984-6000
provner@potteranderson.com

Attorneys for Plaintiff
ZymoGenetics, Inc.

I, MEGHAN WHARTON, declare:

1.    I am an attorney with the law firm of King & Spalding LLP, counsel of record for Plaintiff ZymoGenetics, Inc., ("ZymoGenetics"). I have personal knowledge of the facts set forth in this declaration and can testify competently to those facts.

2.    Attached hereto as Exhibit 1 is a true and correct copy of ZymoGenetics, Inc.'s Amended Notice of Deposition of Defendant Bristol-Myers Squibb Co. Pursuant to Fed.R.Civ.P. 30(b)(6), dated February 12, 2007.

3.    Attached hereto as Exhibit 2 is a true and correct copy of Bristol's Responses and Objections to ZymoGenetics, Inc.'s Amended Notice of Deposition of Bristol-Myers Squibb Co. Pursuant to Fed.R.Civ.P. 30(b)(6), dated March 8, 2007.

4.    Attached hereto as Exhibit 3 is a true and correct copy of a letter from me to counsel for Bristol-Myers Squibb Co. ("Bristol"), Christopher P. Borello, dated March 23, 2007.

5.    Attached hereto as Exhibit 4 is a true and correct copy of a letter from me to counsel for Bristol, Christopher P. Borello, dated April 11 ,2007.

6.    Attached hereto as Exhibit 5 is a true and correct copy of a letter from counsel for Bristol, Christopher P. Borello, to me, dated April 20, 2007.

7.    Attached hereto as Exhibit 6 is a true and correct copy of an e-mail from me to counsel for Bristol, Christopher P. Borello, dated August 2, 2007, as well as Mr. Borello's response to me dated August 30, 2007.

8.    Attached hereto as Exhibit 7 is a true and correct copy of a letter from me to counsel for Bristol, Christopher P. Borello, dated August 30, 2007.

9.    Attached hereto as Exhibit 8 is a true and correct copy of a letter from counsel for Bristol, Christopher P. Borello, to me, dated September 10, 2007.

10.    Attached hereto as Exhibit 9 is a true and correct copy of a letter from counsel for Bristol, Frederick L. Cottrell III, to Magistrate Judge Mary Pat Thynge, regarding Bristol's request to bifurcate the issues of willfulness and damages, filed on October 15, 2007 (D.I. 116).

11.    Attached hereto as Exhibit 10 is a true and correct copy of excerpts from the transcript of the telephone conference held on November 8, 2007, before Magistrate Judge Mary Pat Thynge.

I declare under penalty of perjury under the laws of the State of California and the United States that each of the above statements is true and correct.

Executed on May 23, 2008 in Redwood Shores, California.

Meghan Wharton

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Philip A. Rovner, hereby certify that on May 30, 2008, the within document

was filed with the Clerk of the Court using CM/ECF which will send notification of such

filing(s) to the following; that the document was served on the following counsel as indicated;

and that the document is available for viewing and downloading from CM/ECF.

### BY HAND DELIVERY AND E-MAIL

Frederick L. Cottrell, III, Esq.
Kelly E. Farnan, Esq.
Richard Layton & Finger, P.A.
One Rodney Square
P. O. Box 551
Wilmington, DE  19899
cottrell@rlf.com
farnan@rlf.com

I hereby certify that on May 30, 2008 I have sent by E-mail the foregoing

document to the following non-registered participant:

Christopher P. Borello, Esq.
Colleen Tracy, Esq.
Fitzpatrick Cella Harper & Scinto
30 Rockefeller Plaza
New York, NY  10112
cborello@fchs.com
ctracy@fchs.com

/s/ Philip A. Rovner
Philip A. Rovner  (#3215)
Potter Anderson & Corroon LLP
Hercules Plaza
P. O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com

748348

# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ZYMOGENETICS, INC., a<br>Washington Corporation, | ) ) ) | |
| Plaintiff, | ) ) | C. A. No. 06-500-*** |
| v. | ) ) ) | |
| BRISTOL-MYERS SQUIBB CO.,<br>a Delaware Corporation, and<br>DOES 1 through 100, | ) ) ) ) | |
| Defendants. | ) ) | |

### ZYMOGENETICS, INC.'S AMENDED NOTICE OF DEPOSITION OF DEFENDANT BRISTOL-MYERS SQUIBB CO. PURSUANT TO FED. R. CIV. P. 30(b)(6)

PLEASE TAKE NOTICE that, pursuant to Rule 30(b)(6) of the Federal Rules of

Civil Procedure, Plaintiff ZymoGenetics, Inc. ("ZymoGenetics") will take the deposition of

Defendant Bristol-Myers Squibb Co. ("Bristol-Myers") in the offices of Potter Anderson &

Corroon LLP, Hercules Plaza, 1313 North Market Street, Wilmington, DE 19801, or at some

other mutually agreeable location. The deposition will be taken before a notary public or

some other person duly authorized to administer an oath, and will be recorded

stenographically, and may also be recorded by videotape and audio tape, and may be

recorded in real time. Testimony shall be taken beginning March 16, 2007, commencing at

9:00 a.m. and continuing until completed, or at some other mutually agreeable date and time.

The deposition will be taken for the purposes of discovery, to perpetuate the testimony of

witness(es) for use at trial, and for all other purposes permitted under the Federal Rules of Civil Procedure, the Local Rules of this Court, or any other applicable rules.

## PRELIMINARY STATEMENT

Bristol-Myers shall designate one or more persons to testify regarding the topics listed below, in accordance with the following Definitions/Instructions.

## DEFINITIONS

A.     The term "ZymoGenetics" shall mean Plaintiff ZymoGenetics, Inc.

B.     The term "Bristol-Myers" shall mean Defendant Bristol-Myers Squibb Co., and any of its predecessors-in-interest, divisions, subsidiaries, officers, directors, trustees, employees, staff members, paid consultants, agents, counsel, or other representatives.

C.     The term "patents-in-suit" shall mean U.S. Patent Nos. 6,843,725 and 6,018,026.

D.     The term "'725 patent" means U.S. Patent Nos. 6,843,725.

E.     The term "'026 patent" means U.S. Patent No. 6,018,026.

F.     The term "Bristol-Myers fusion protein product(s)" means Orencia®, abatacept, CTLA4-Ig and/or any structural, chemical, or functional variant or related fusion protein that has received approval from the United States Food and Drug Administration.

G.     The term "FDA" means the United States Food and Drug Administration.

H.     The connective "and/or" shall be construed either disjunctively or conjunctively, as necessary, to bring within the scope of the discovery request all responses that otherwise might be construed to be outside of its scope. The term "all" shall mean "any and all," and the term "any" shall mean "any and all." The singular of any word or phrase

-2-

shall include the plural of such word or phrase, and the plural of any word or phrase shall include the singular of such word or phrase.

I.     The term "referring or relating to" means concerning, mentioning, indicating, disclosing, discussing, analyzing, serving as a basis for, supporting, describing, or in any other way bearing upon or illuminating the subject matter into which the inquiry is made.

J.     The term "communication" or "communications" means the transmittal of information (in the form of facts, ideas, inquiries, or otherwise).

## TOPICS

1.     The organizational structure of Bristol-Myers.

2.     The conception, design, research, development, and testing of each Bristol-Myers fusion protein product(s).

3.     The information submitted to the FDA regarding each Bristol-Myers fusion protein product(s) relating to obtaining FDA approval of such products.

4.     Any and all communications between Bristol-Myers and any governmental or quasi-governmental agency, including the FDA, in relation to Bristol-Myers fusion protein product(s).

5.     The manufacture of each Bristol-Myers fusion protein product(s).

6.     The sale and offer for sale of each Bristol-Myers fusion protein product(s).

7.     All sales (actual and projected) information for each Bristol-Myers fusion protein product(s), including the terms of any sales.

8.     All marketing information for each Bristol-Myers fusion protein product(s).

9.     All costs for the sale, marketing, manufacture, design, development of each Bristol-Myers fusion protein product(s).

10.    All gross and net profits for the sale of each Bristol-Myers fusion protein product(s).

11.    The marketing, pricing, placement, packaging and promotion of each Bristol-Myers fusion protein product(s), including any related publications.

12.    Any and all licenses referring or relating to each Bristol-Myers fusion protein product(s), including the terms of such licenses.

13.    Any and all communications referring or relating to ZymoGenetics.

14.    Any and all communications referring or relating to the patents-in-suit.

15.    Any and all communications referring or relating to the infringement or noninfringement of the patents-in-suit by Bristol-Myers.

16.    Any and all communications referring or relating to the validity or invalidity of the patents-in-suit.

17.    Any and all communications referring or relating to the enforceability or unenforceability of the patents-in-suit.

18.    Any studies, analyses, opinions of counsel, or communications regarding infringement or validity of the patents-in-suit, or any foreign counterpart patents, and reliance by Bristol-Myers on such documents and/or communications.

19.    Other lawsuits, mediations, arbitrations, or negotiations, or prospective lawsuits, mediations, arbitrations, or negotiations with regard to Bristol-Myers fusion protein product(s).

20.    The factual bases for Bristol-Myers' contention that it does not infringe the patents-in-suit.

21.    The factual bases for Bristol-Myers' contention that its activities are immunized from a claim of infringement by 35 U.S.C. 271(e)(1).

22.    The factual bases for Bristol-Myers' contention that the patents-in-suit are invalid.

23.    Any and all communications referring or relating to the present litigation.

24.    Bristol-Myers' knowledge and awareness of the patents-in-suit.

25.    Bristol-Myers' efforts to identify, retrieve, collect, review, and produce documents in response to ZymoGenetics' requests for the production of documents and things in the present litigation.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Paul J. Andre
Perkins Coie LLP
101 Jefferson Drive
Menlo Park, California 94025-1114
(650) 838-4300

By: /s/ Philip A. Rovner
       Philip A. Rovner (#3215)
       Hercules Plaza
       P. O. Box 951
       Wilmington, DE 19899
       (302) 984-6000
       provner@potteranderson.com

*Attorneys for Plaintiff*
*ZymoGenetics, Inc.*

Dated: February 12, 2007
777509

-5-

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Philip A. Rovner, hereby certify that on February 12, 2007, the within document was filed with the Clerk of the Court using CM/ECF which will send notification of such filing(s) to the following; that the document was served on the following counsel as indicated; and that the document is available for viewing and downloading from CM/ECF.

### BY HAND DELIVERY AND E-MAIL

Frederick L. Cottrell, III, Esq.
Kelly E. Farnan, Esq.
Richard Layton & Finger, P.A.
One Rodney Square
P. O. Box 551
Wilmington, DE 19899
cottrell@rlf.com
farnan@rlf.com

I hereby certify that on February 12, 2007 I have sent by E-mail the foregoing document to the following non-registered participant:

Christopher P. Borello, Esq.
Fitzpatrick Cella Harper & Scinto
30 Rockefeller Plaza
New York, NY 10112
cborello@fchs.com

/s/ Philip A. Rovner
Philip A. Rovner (#3215)
Potter Anderson & Corroon LLP
Hercules Plaza
P. O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com

# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| ZYMO GENETICS, INC., a<br>Washington Corporation, | ) ) ) | |
| Plaintiff, | ) ) | Civil Action No: 06-500-*** |
| v. | ) ) | |
| BRISTOL-MYERS SQUIBB CO.,<br>a Delaware Corporation, and<br>DOES 1 through 100, | ) ) ) ) | |
| Defendants. | ) | |

**BRISTOL'S RESPONSES AND OBJECTIONS TO ZYMOGENETICS,
INC.'S AMENDED NOTICE OF DEPOSITION OF
BRISTOL-MYERS SQUIBB CO. PURSUANT TO FED. R. CIV. P. 30(b)(6)**

Bristol-Myers Squibb Company ("Bristol") responds and objects to

ZymoGenetics, Inc.'s Amended Notice of Deposition of Defendant Bristol Pursuant to Fed. R.

Civ. P. 30(b)(6) ("ZymoGenetics' Amended 30(b)(6) Notice") on the following grounds:

**GENERAL OBJECTIONS**

1.      Bristol incorporates herein its General Objections to ZymoGenetics' First Set of

Interrogatories and its General Objections to ZymoGenetics' First Set of Requests for the

Production of Documents and Things.

2.      Bristol objects to the topics of ZymoGenetics' Amended 30(b)(6) Notice to the

extent they seek information not within the possession, custody or control of Bristol, and

specifically objects to requests for information in the possession of Plaintiff or third parties.

3.      Bristol objects to the topics of ZymoGenetics' Amended 30(b)(6) Notice to the

extent they are vague, ambiguous, overly broad, unduly burdensome, not reasonably calculated

to lead to the discovery of admissible evidence, seek information that is irrelevant to any claim

or defense in this action, or would require Bristol to engage in an unreasonable preparation of a witness.

4.      Bristol objects to the ZymoGenetics' Amended 30(b)(6) Notice to the extent that they purport to impose obligations on Bristol that exceed its obligations under the Federal Rules of Civil Procedure, the Local Civil Rules of the United States District Court for the District of Delaware, the Scheduling Order in this action or applicable case law.

5.      Bristol objects to providing information covering the period after the filing of the Complaint, with the exception of information regarding sales of Orencia®. Bristol further objects to the topics of the ZymoGenetics' Amended 30(b)(6) Notice seeking information relating to facts or contentions as to which no issue presently exists because ZymoGenetics has not pleaded such allegations with enough specificity for Bristol to be able to respond.

6.      Bristol objects to the topics of ZymoGenetics' Amended 30(b)(6) Notice to the extent that they seek information subject to a confidentiality obligation or protective order involving a third party and for which the disclosure thereof would violate that confidentiality obligation or protective order.

7.      To the extent Bristol produces a 30(b)(6) witness for a particular topic, it does not concede that the information requested during the deposition is relevant to this action. Bristol expressly reserves the right to object to further discovery into the subject matter of any of the topics of ZymoGenetics' Amended 30(b)(6) Notice.

8.      The objections and limitations contained herein are subject to and without waiver of the right to make additional or supplemental objections to this or other 30(b)(6) Notices.

9.      Bristol objects to ZymoGenetics' definition of "'725 patent" as incorrect. United States Patent No. 5,843,725, not 6,843,725 was cited in and appended to ZymoGenetics'

2

Complaint dated August 14, 2006. Accordingly, Bristol objects to ZymoGenetics' definition of the term "Patents-in-Suit".

10.    Bristol objects to ZymoGenetics' definitions of the "'725 patent" and the "'026 patent" as vague and ambiguous in that it is not clear whether ZymoGenetics is referring to the reexam certificates or the patents before reexam. Accordingly, Bristol objects to ZymoGenetics' definition of the term "Patents-in-Suit".

11.    Bristol objects to the definition of the term "Bristol-Myers fusion protein product(s)" in ZymoGenetics' Amended 30(b)(6) Notice as overly broad. Bristol objects to each topic of ZymoGenetics' Amended 30(b)(6) Notice to the extent it seeks information relating to Bristol's products other than Orencia®, or fusion protein products other than the CTLA4-Ig that is in Orencia®, on the grounds that such information is not relevant to any claim or defense in this action and not reasonably calculated to lead to the discovery of admissible evidence.

12.    Bristol objects to the date of the noticed deposition as premature, as this case is in the early stages of discovery. Bristol is endeavoring to identify the appropriate designee(s) for the topics, and will produce such designee(s) for deposition on a mutually convenient date.

13.    Bristol objects to the place of the noticed deposition as unreasonable and burdensome. Bristol is endeavoring to identify the appropriate designee(s) for deposition, and will produce such designee(s) for deposition at the offices of Fitzpatrick, Cella, Harper & Scinto, 30 Rockefeller Plaza, New York, New York 10112.

14.    Bristol objects to the topics of ZymoGenetics' Amended 30(b)(6) Notice to the extent that they seek information as to matters not known or reasonably available to Bristol. By stating that it will produce a witness competent to testify on a topic, Bristol does not represent

3

that it has any relevant information on the topic but merely that Bristol's designated witness(es) will testify to the extent Bristol has any information on the topic.

15.     Bristol objects ZymoGenetics' Amended 30(b)(6) Notice as being unduly burdensome and oppressive to the extent it seeks information that is duplicative of information already provided in this action.

16.     Bristol objects to ZymoGenetics' Amended 30(b)(6) Notice to the extent that it seeks to obtain expert testimony from a non-expert lay person or fact witness.

17.     Bristol objects to the definition of "Bristol-Myers" in ZymoGenetics' Amended 30(b)(6) Notice as overbroad and unduly burdensome.

4

## SPECIFIC OBJECTIONS TO AMENDED 30(b)(6) NOTICE TOPICS

### Topic No. 1

The organizational structure of Bristol-Myers.

### Response to Topic No. 1

Bristol objects to this category as vague, ambiguous, overly broad and unduly burdensome.

Subject to and without waiver of the foregoing General and Specific Objections, Bristol will produce a witness competent to testify on this topic.

### Topic No. 2

The conception, design, research, development, and testing of each Bristol-Myers fusion protein product(s).

### Response to Topic No. 2

Bristol objects to this topic as premature as this case is in the early stage of fact discovery. Bristol objects to this topic as overly broad and unduly burdensome. Bristol objects to this topic to the extent it seeks information relating to Bristol's products other than Orencia®, or fusion protein products other than the CTLA4-Ig that is in Orencia®, on the grounds that such information is not relevant and not reasonably calculated to lead to the discovery of admissible evidence. Bristol will not produce a witness to testify regarding fusion proteins other than the fusion protein contained in Orencia®, even if such other fusion proteins exist.

Subject to and without waiver of the foregoing General and Specific Objections, Bristol will produce a witness competent to testify generally about the conception, design, research, development and testing of the CTLA4-Ig contained in Orencia® after sufficient discovery has taken place.

5

**Topic No. 3**

The information submitted to the FDA regarding each Bristol-Myers fusion protein products(s) relating to obtaining FDA approval on such products.

**Response to Topic No. 3**

        Bristol objects to this topic as premature as this case is in the early stage of fact discovery. Bristol objects to this topic as overly broad and unduly burdensome. Bristol objects this topic to the extent it seeks information relating to Bristol's products other than Orencia®, or fusion protein products other than the CTLA4-Ig that is in Orencia®, on the grounds that such information is not relevant and not reasonably calculated to lead to the discovery of admissible evidence. Bristol will not produce a witness to testify regarding fusion proteins other than the fusion protein contained in Orencia®, even if such other fusion proteins exist.

        Subject to and without waiver of the foregoing General and Specific Objections, Bristol will produce a witness competent to testify generally about the information that has been submitted to the United States Food and Drug Administration regarding the CTLA4-Ig that is in Orencia® after sufficient discovery has taken place.

**Topic No. 4**

Any and all communications between Bristol-Myers and any governmental or quasi-governmental agency, including the Federal Food and Drug Administration, in relation to Bristol-Myers fusion protein product(s).

**Response to Topic No. 4**

        Bristol objects to this topic as premature as this case is in the early stage of fact discovery. Bristol objects to this topic as vague, ambiguous, overly broad and unduly burdensome. Bristol objects to this topic to the extent it seeks information relating to Bristol's products other than Orencia®, or fusion protein products other than the CTLA4-Ig that is in

6

Orencia®, on the grounds that such information is not relevant and not reasonably calculated to lead to the discovery of admissible evidence. Bristol objects to this topic to the extent that it seeks information related to communications with any governmental or quasi-governmental agency outside the United States. Bristol will not produce a witness to testify regarding fusion proteins other than the fusion protein contained in Orencia®, even if such other fusion proteins exist.

      Subject to and without waiver of the foregoing General and Specific Objections, Bristol will produce a witness competent to testify generally about information that has been submitted to the United States Food and Drug Administration regarding the CTLA4-Ig that is in Orencia® after sufficient discovery has taken place.

### Topic No. 5

The manufacture of each Bristol-Myers fusion protein product(s).

### Response to Topic No. 5

      Bristol objects to this topic as premature as this case is in the early stage of fact discovery. Bristol objects to this topic as overly broad and unduly burdensome. Bristol objects to this topic to the extent it seeks information relating to Bristol's products other than Orencia®, or fusion protein products other than the CTLA4-Ig that is in Orencia®, on the grounds that such information is not relevant and not reasonably calculated to lead to the discovery of admissible evidence. Bristol will not produce a witness to testify regarding fusion proteins other than the fusion protein contained in Orencia®, even if such other fusion proteins exist.

      Subject to and without waiver of the foregoing General and Specific Objections, Bristol will produce a witness competent to testify about the manufacture of the CTLA4-Ig that is in Orencia® after sufficient discovery has taken place.

7

**Topic No. 6**

The sale and offer for sale of each Bristol-Myers fusion protein product(s).

**Response to Topic No. 6**

        Bristol objects to this topic as premature as this case is in the early stage of fact discovery. Bristol objects to this topic as overly broad and unduly burdensome. Bristol objects to this topic to the extent it seeks information relating to Bristol's products other than Orencia®, or fusion protein products other than the CTLA4-Ig that is in Orencia®, on the grounds that such information is not relevant and not reasonably calculated to lead to the discovery of admissible evidence. Bristol will not produce a witness to testify regarding fusion proteins other than the fusion protein contained in Orencia®, even if such other fusion proteins exist. Bristol objects to this topic to the extent that it seeks information related to sales and offers for sale of Orencia® outside the United States.

        Subject to and without waiver of the foregoing General and Specific Objections, Bristol will produce a witness competent to testify about the sale of Orencia® in the United States and the offer for sale of Orencia® in the United States after sufficient discovery has taken place.

**Topic No. 7**

All sales (actual and projected) information for each Bristol-Myers fusion protein product(s), including the terms of any sales.

**Response to Topic No. 7**

        Bristol objects to this topic as premature as this case is in the early stage of fact discovery. Bristol objects to this topic as vague, ambiguous, overly broad and unduly burdensome. Bristol objects to this topic to the extent it seeks information relating to Bristol's

8

products other than Orencia®, or fusion protein products other than the CTLA4-Ig that is in
Orencia®, on the grounds that such information is not relevant and not reasonably calculated to
lead to the discovery of admissible evidence. Bristol will not produce a witness to testify
regarding fusion proteins other than the fusion protein contained in Orencia®, even if such other
fusion proteins exist. Bristol objects to this topic to the extent that it seeks information related to
sales (actual and projected) of Orencia® outside the United States.

        Subject to and without waiver of the foregoing General and Specific Objections,
Bristol will produce a witness competent to testify about the sale of Orencia® in the United
States and the offer for sale of Orencia® in the United States after sufficient discovery has taken
place.

### Topic No. 8

All marketing information for each Bristol-Myers fusion protein product(s).

### Response to Topic No. 8

        Bristol objects to this topic as premature as this case is in the early stage of fact
discovery. Bristol objects to this topic as vague, ambiguous, overly broad and unduly
burdensome. Bristol objects to this topic to the extent it seeks information relating to Bristol's
products other than Orencia®, or fusion protein products other than the CTLA4-Ig that is in
Orencia®, on the grounds that such information is not relevant and not reasonably calculated to
lead to the discovery of admissible evidence. Bristol will not produce a witness to testify
regarding fusion proteins other than the fusion protein contained in Orencia®, even if such other
fusion proteins exist. Bristol objects to this topic to the extent that it seeks information related to
marketing of Orencia® outside the United States.

9

Subject to and without waiver of the foregoing General and Specific Objections, Bristol will produce a witness competent to testify about the marketing of Orencia® in the United States after sufficient discovery has taken place.

**Topic No. 9**

All costs for the sale, marketing, manufacture, design, development of each Bristol-Myers fusion protein product(s).

**Response to Topic No. 9**

Bristol objects to this topic as premature as this case is in the early stage of fact discovery. Bristol objects to this topic as vague, ambiguous, overly broad and unduly burdensome. Bristol objects to this topic to the extent it seeks information relating to Bristol's products other than Orencia®, or fusion protein products other than the CTLA4-Ig that is in Orencia®, on the grounds that such information is not relevant and not reasonably calculated to lead to the discovery of admissible evidence. Bristol will not produce a witness to testify regarding fusion proteins other than the fusion protein contained in Orencia®, even if such other fusion proteins exist. Bristol objects to this topic to the extent that it seeks information related to costs for the sale, marketing, manufacture, design and development of Orencia® outside the United States.

Subject to and without waiver of the foregoing General and Specific Objections, Bristol will produce a witness competent to testify about the costs for the marketing, manufacture, design and development of Orencia® in the United States after sufficient discovery has taken place.

**Topic No. 10**

All gross and net profits for the sale of each Bristol-Myers fusion protein product(s).

10

**Response to Topic No. 10**

   Bristol objects to this topic as premature as this case is in the early stage of fact discovery. Bristol objects to this topic as overly broad and unduly burdensome. Bristol objects to this topic to the extent it seeks information relating to Bristol's products other than Orencia®, or fusion protein products other than the CTLA4-Ig that is in Orencia®, on the grounds that such information is not relevant and not reasonably calculated to lead to the discovery of admissible evidence. Bristol will not produce a witness to testify regarding fusion proteins other than the fusion protein contained in Orencia®, even if such other fusion proteins exist. Bristol objects to this topic to the extent that it seeks information related to gross and net profits for the sale of Orencia® outside the United States.

   Subject to and without waiver of the foregoing General and Specific Objections, Bristol will produce a witness competent to testify about the gross and net profits for the sale of Orencia® in the United States after sufficient discovery has taken place.

**Topic No. 11**

The marketing, pricing, placement, packaging and promotion of each Bristol-Myers fusion protein product(s), including any related publications.

**Response to Topic No. 11**

   Bristol objects to this topic as premature as this case is in the early stage of fact discovery. Bristol objects to this topic as overly broad and unduly burdensome. Bristol objects to this topic to the extent it seeks information relating to Bristol's products other than Orencia®, or fusion protein products other than the CTLA4-Ig that is in Orencia®, on the grounds that such information is not relevant and not reasonably calculated to lead to the discovery of admissible evidence. Bristol will not produce a witness to testify regarding fusion proteins other than the

11

fusion protein contained in Orencia®, even if such other fusion proteins exist. Bristol objects to

this topic to the extent that it seeks information related to marketing, pricing, placement,

packaging and promotion of Orencia® outside the United States.

Subject to and without waiver of the foregoing General and Specific Objections,

Bristol will produce a witness competent to testify about the marketing, pricing, placement,

packaging, and promotion of Orencia® in the United States after sufficient discovery has taken

place.

**Topic No. 12**

Any and all licenses referring to or relating to each Bristol-Myers fusion protein product(s),
including the terms of such licenses.

**Response to Topic No. 12**

Bristol objects to this topic as premature as this case is in the early stage of fact

discovery. Bristol objects to this topic as vague, ambiguous, overly broad and unduly

burdensome. Bristol objects to this topic to the extent it seeks information relating to Bristol's

products other than Orencia®, or fusion protein products other than the CTLA4-Ig that is in

Orencia®, on the grounds that such information is not relevant and not reasonably calculated to

lead to the discovery of admissible evidence. Bristol will not produce a witness to testify

regarding fusion proteins other than the fusion protein contained in Orencia®, even if such other

fusion proteins exist. Bristol objects to this topic to the extent that it seeks information related to

licenses referring to or relating to Orencia® outside the United States.

Subject to and without waiver of the foregoing General and Specific Objections,

Bristol will produce a witness competent to testify about any licenses for United States patents

that allegedly cover Orencia® after sufficient discovery has taken place.

12

**Topic No. 13**

Any and all communications referring to or relating to ZymoGenetics.

**Response to Topic No. 13**

Bristol objects to producing a 30(b)(6) witness on this topic as it is overly broad and unduly burdensome. Bristol also objects to this topic to the extent it seeks information protected from discovery by the attorney-client privilege or work product immunity.

**Topic No. 14**

Any and all communications referring or relating to the patents-in-suit.

**Response to Topic No. 14**

Bristol objects to producing a 30(b)(6) witness on this topic as it is overly broad and unduly burdensome. Bristol also objects to this topic to the extent it seeks information protected from discovery by the attorney-client privilege or work product immunity.

**Topic No. 15**

Any and all communications referring or relating to the infringement or noninfringement of the patents-in-suit by Bristol-Myers.

**Response to Topic No. 15**

Bristol objects to providing a 30(b)(6) witness on this topic as it seeks testimony that is protected by the attorney client privilege or work product immunity, it seeks information regarding Bristol's contentions that is properly within the province of an expert witness, and discovery of such information is premature and not properly sought from a non-expert lay witness.

13

RLF1-3124759-1

**Topic No. 16**

Any and all communications referring or relating to the validity or invalidity of the patents-in-suit.

**Response to Topic No. 16**

        Bristol objects to providing a 30(b)(6) witness on this topic as it seeks testimony that is protected by the attorney client privilege or work product immunity, it seeks information regarding Bristol's contentions that is properly within the province of an expert witness, and discovery of such information is premature and not properly sought from a non-expert lay witness.

**Topic No. 17**

Any and all communications referring or relating to the enforceability or unenforceability of the patents-in-suit.

**Response to Topic No. 17**

        Bristol objects to providing a 30(b)(6) witness on this topic as it seeks testimony that is protected by the attorney client privilege or work product immunity, it seeks information regarding Bristol's contentions that is properly within the province of an expert witness, and discovery of such information is premature and not properly sought from a non-expert lay witness.

**Topic No. 18**

Any studies, analyses, opinions of counsel, or communications regarding infringement or validity of the patents-in-suit, or any foreign counterpart patents, and reliance by Bristol-Myers on such documents and/or communications.

**Response to Topic No. 18**

   Bristol objects to providing a 30(b)(6) witness on this topic as it seeks testimony that is protected by the attorney client privilege or work product immunity and discovery of such information is premature. To the extent that Bristol decides to rely on any such information to rebut a willful infringement claim and to the extent that such information exists, Bristol will reevaluate providing a witness to testify regarding this topic.

**Topic No. 19**

Other lawsuits, mediations, arbitrations, or negotiations, or prospective lawsuits, mediations, arbitrations, or negotiations with regard to Bristol-Myers fusion protein product(s).

**Response to Topic No. 19**

   Bristol objects to this topic as premature as this case is in the early stage of fact discovery. Bristol objects to this topic as vague, ambiguous, overly broad and unduly burdensome. Bristol objects to this topic to the extent it seeks information relating to Bristol's products other than Orencia®, or fusion protein products other than the CTLA4-Ig that is in Orencia®, on the grounds that such information is not relevant and not reasonably calculated to lead to the discovery of admissible evidence. Bristol objects to this topic to the extent that it seeks information related to lawsuits, mediations, arbitrations, or negotiations, or prospective lawsuits, mediations, arbitrations, or negotiations relating to Orencia® outside the United States. Bristol objects to this topic to the extent that it seeks testimony that is protected by the attorney client privilege or work product immunity.

   Subject to and without waiver of the foregoing General and Specific Objections, Bristol will produce a witness competent to testify about lawsuits, mediations, arbitrations, or

15

negotiations, or prospective lawsuits, mediations, arbitrations with regard to Orencia®, to the extent that the information sought is publicly available.

**Topic No. 20**

The factual bases for Bristol-Myers' contention that it does not infringe the patents-in-suit.

**Response to Topic No. 20**

Bristol objects to providing a 30(b)(6) witness on this topic as it seeks testimony that is protected by the attorney client privilege or work product immunity, it seeks information regarding Bristol's contentions that is properly within the province of an expert witness, and discovery of such information is premature and not properly sought from a non-expert lay witness. Bristol objects to this topic as the information sought is more properly explored through interrogatories.

**Topic No. 21**

The factual bases for Bristol-Myers' contention that its activities are immunized from a claim of infringement by 35 U.S.C. 271(e)(1).

**Response to Topic No. 21**

Bristol objects to providing a 30(b)(6) witness on this topic as it seeks testimony that is protected by the attorney client privilege or work product immunity, it seeks information regarding Bristol's contentions that is properly within the province of an expert witness, and discovery of such information is premature and not properly sought from a non-expert lay witness. Bristol objects to this topic as the information sought is more properly explored through interrogatories.

**Topic No. 22**

The factual bases for Bristol-Myers' contention that the patents-in-suit are invalid.

**Response to Topic No. 22**

Bristol objects to providing a 30(b)(6) witness on this topic as it seeks testimony that is protected by the attorney client privilege or work product immunity, it seeks information regarding Bristol's contentions that is properly within the province of an expert witness, and discovery of such information is premature and not properly sought from a non-expert lay witness. Bristol objects to this topic as duplicative of ZymoGenetics' interrogatories. Bristol objects to this topic as the information sought is more properly explored through interrogatories.

**Topic No. 23**

Any and all communications referring or relating to the present litigation.

**Response to Topic No. 23**

Bristol objects to producing a 30(b)(6) witness on this topic as it is overly broad and unduly burdensome. Bristol also objects to the extent that this topic seeks information that is protected by the attorney client privilege or work product immunity.

**Topic No. 24**

Bristol-Myers' knowledge and awareness of the patents-in-suit.

**Response to Topic No. 24**

Bristol objects to producing a witness on this topic as it is overly broad and unduly burdensome. Bristol also objects to this topic as vague and ambiguous. Bristol also objects to this topic as duplicative of ZymoGenetics' interrogatories. Bristol also objects to the

17

extent that this topic seeks information that is protected by the attorney client privilege or work

product immunity.

### Topic No. 25

Bristol-Myers' efforts to identify, retrieve, collect, review, and produce documents in response to
ZymoGenetics' requests for the production of documents and things in the present litigation.

### Response to Topic No. 25

Bristol objects to this topic as premature as Bristol's efforts to identify, retrieve,

collect, review, and produce documents in response to ZymoGenetics' requests for the

production of documents and things are ongoing.

Subject to and without waiver of the foregoing General and Specific Objections,

Bristol will produce a witness competent to testify about Bristol's efforts to identify, retrieve,

collect, review, and produce documents in response to ZymoGenetics' requests for the

production of documents and things after sufficient discovery has taken place.

18

OF COUNSEL:

Robert L. Baechtold
Scott K. Reed
Gregory B. Sephton
Christopher P. Borello
Robert S. Schwartz
FITZPATRICK CELLA HARPER & SCINTO
30 Rockefeller Plaza
New York, N.Y. 10112
Telephone: (212) 218-2100
Facsimile: (212) 218-2200


Dated: March 8, 2007

*Kelly E. Farnan*

Frederick L. Cottrell, III (#2555)
cottrell@rlf.com
Kelly E. Farnan (#4395)
farnan@rlf.com
Richards, Layton & Finger, P.A.
One Rodney Square, P.O. Box 551
Wilmington, DE 19899
(302) 651-7700


*Attorneys for Defendant*
*Bristol-Myers Squibb Co.*

UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on March 8, 2007, I electronically filed the foregoing

document with the Clerk of Court using CM/ECF and caused the same to be served on the

defendant at the address and in the manner indicated below:

### BY E-MAIL AND HAND DELIVERY

Philip A. Rovner, Esquire
Potter, Anderson & Corroon
Hercules Plaza
Wilmington, DE 19899

### BY E-MAIL

Paul J. Andre
Perkins Coie LLP
101 Jefferson Drive
Menlo Park, CA 94025-1114

_Kelly E. Farnan_
Kelly E. Farnan (#4395)
Farnan@rlf.com

# EXHIBIT 3



101 Jefferson Drive
Menlo Park, CA 94025-1114
PHONE: 650.838.4300
FAX: 650.838.4350
www.perkinscoie.com

Meghan Ashley Wharton
PHONE: (650) 838-4363
FAX:    (602) 648-7038
EMAIL: MWharton@perkinscoie.com

March 23, 2007

<u>**Via E-mail and U.S. mail**</u>

Christopher P. Borello
Fitzpatrick, Cella, Harper & Scinto
30 Rockefeller Plaza
New York, New York 10112-3801

Re:    *Zymogenetics, Inc. v. Bristol-Myers Squibb Co.*, Civil Action No. C06-500

Dear Christopher:

     We write to address (a) certain deficiencies in Bristol-Myers Squibb, Co.'s ("BMS") responses to Zymogenetics, Inc.'s ("Zymogenetics") First Set of Interrogatories ("Interrogatories"), and (b) to confirm our meet and confer discussions on March 15, 2007 with respect to BMS' failure to designate a witness or witnesses to testify on behalf of BMS or to otherwise schedule a deposition in response to Zymogenetics, Inc.'s Amended Notice of Deposition of Defendant Bristol-Myers Squibb Co. Pursuant to Fed. R. Civ. P. 30(b)(6) ("Deposition Notice").

     Unless we can resolve these issues before the March 30, 2007 hearing with the Court, we intend to seek the Court's assistance in resolving these disputes with BMS.

**Responses to Interrogatories**

     On March 7, 2007, Radhika Tandon sent a letter to your attention addressing certain deficiencies in BMS' responses to the Interrogatories. I have attached a copy of Ms. Tandon's letter for your reference. We have not yet received a response to the March 7, 2007 letter, and BMS has not yet supplemented its responses to the Interrogatories.

March 23, 2007
Page 2

By way of this letter, we hereby request that BMS immediately supplement its responses to the Interrogatories in compliance with its obligations under the relevant rules of civil procedure.

## BMS 30(b)(6) Deposition

We served BMS with the Deposition Notice on February 12, 2007. More than one month has passed since the date of the Deposition Notice and BMS has not yet made a witness available for the deposition, much less identified the proper witnesses for such a deposition.

### BMS has failed to designate witnesses or schedule depositions.

In response to the Deposition Notice, BMS served Bristol's Responses and Objections to Zymogenetics, Inc.'s Amended Notice of Deposition of Bristol-Myers Squibb Co. Pursuant to Fed. R. Civ. P. 30(b)(6) ("Deposition Notice Response"). In its Deposition Notice Response, BMS refused to timely provide a 30(b)(6) witness to testify regarding twenty-four of the twenty-five topics. Further, in the Deposition Notice Response, BMS refused to ever provide a 30(b)(6) witness to testify regarding ten of the topics. After receiving BMS' Deposition Notice Response, we arranged for a telephone conference to discuss the issues raised by BMS.

On March 15, 2007, during our meet and confer telephone conference, you indicated that several different witnesses will be required to testify regarding the different topics listed in the Deposition Notice. You stated that BMS would be supplying names for witnesses and suggested dates within the near future for each of the topics for which you agreed to provide a witness. It has now been a week since our conversation and BMS has not disclosed a single witness that will testify regarding the topics in the Deposition Notice and has not contacted us regarding potential dates for the depositions.

### Topics for which BMS did not agree to provide a witness – limitation of topic.

BMS refused to provide a 30(b)(6) witness to testify regarding several topics. During our discussion, you indicated that BMS would be willing to provide a 30(b)(6) witness for certain topics if the topics were narrowed. As a result of your representation, we are willing to narrow the following topic as follows:

*Original Topic 13:*    Any and all communications referring or relating to Zymogenetics.

*Narrowed Topic 13:*    Any and all communications referring or relating to Zymogenetics and also relating or referring to Orencia®, CTLA4-Ig or the patents-in-suit.

March 23, 2007
Page 3

## Topics for which BMS did not agree to provide a witness -- expert witness.

In response to topics 15, 16 and 17, BMS refused to provide a 30(b)(6) witness because BMS believes that the topics are "properly within the province of an expert witness. . . and not properly sought from a non-expert lay witness." In response to topics 20, 21 and 22, BMS refused to provide a BMS 30(b)(6) witness because BMS believes that the topics are "properly within the province of an expert witness. . . and not properly sought from a non-expert lay witness" and that such information is "more properly explored through interrogatories."

We are entitled to testimony from a BMS 30(b)(6) witness on topics 15, 16 and 17 because these are issues that BMS has put at issue in this case and directly relate to BMS' allegations in its affirmative defenses and/or counterclaims that it does not infringe the patents, that the patents are invalid and that the patents are unenforceable. Topics 15, 16 and 17 relate to communications in which factual circumstances relating to these allegations are discussed. We intend to question the BMS 30(b)(6) witness regarding the contents and factual circumstances of these communications. Testimony regarding the topics or contents of communications does not require the opinion of an expert therefore these topics are appropriately directed toward a BMS 30(b)(6) lay witness.

We are entitled to testimony from a BMS 30(b)(6) lay witness on topics 20, 21 and 22 because these topics relate to factual allegations supporting BMS' affirmative defenses and/or counterclaims. With regard to topics 20 and 22, BMS refuses to provide a 30(b)(6) witness to testify regarding the factual bases supporting BMS' allegations of noninfringement and invalidity asserted in its affirmative defenses and counterclaims. With regard to topic 21, BMS refuses to provide a 30(b)(6) witness to testify regarding the factual bases supporting BMS' allegations under 35 U.S.C. § 271(e) asserted in its affirmative defenses. BMS must have asserted these affirmative defenses and counterclaims based on some factual support.

Your response that topics 20, 21 and 22 are properly within the province of an expert is misplaced. By seeking testimony regarding these topics we are seeking facts. Your response that the testimony and information sought as to topics 20, 21 and 22 is more properly explored through interrogatories is irrelevant. First, as of the date of this letter, BMS has refused or otherwise failed to answer interrogatories relating to these topics. Further, pursuant to Fed. R. Civ. P. 26(d), Zymogenetics can determine what type of discovery tools are best suited to allow us to obtain the information necessary for us to properly prepare the case for trial. While BMS may prefer to respond to the issues presented in these topics through responses to interrogatories, that decision is not for BMS to make.

March 23, 2007
Page 4

<u>Topics for which BMS did not agree to provide a witness – related to litigation.</u>

Your refusal to provide a witness to testify regarding any communications referring or relating to the present litigation is puzzling. While we agree that a BMS 30(b)(6) witness will not testify regarding communications subject to the attorney-client privilege or the work product doctrine, subject to any waiver that may occur in the event that BMS has and elects to assert a an advice of counsel defense to a willfulness allegation, you do not provide adequate justification for refusing to provide a witness to testify as to non-protected communications. Further, your ongoing obligation to produce relevant documents includes an obligation to produce non-privileged communications relating to the lawsuit and such communications are an appropriate topic for a BMS 30(b)(6) witness.

<u>Topics for which BMS did not agree to provide a witness – awareness of patents.</u>

Finally, your refusal to provide a BMS 30(b)(6) witness to testify regarding topic 24 regarding BMS' awareness of the patents-in-suit is inappropriate. First, your objection to this topic based on the assertion that the topic is duplicative of the Interrogatories is incorrect and irrelevant. First, the only interrogatory dealing with BMS' knowledge of the Zymogenetics patents requests information relating to first awareness or knowledge. The deposition topic requests testimony regarding BMS' knowledge and awareness of the patents over time. As such, the interrogatory and the topic are not duplicative. Second, as discussed above pursuant to Fed. R. Civ. P. 26(d), we determine what types of discovery tools are best suited for our case. We have chosen to explore the facts surrounding BMS' knowledge of the patents-in-suit through a 30(b)(6) deposition. BMS does not have the liberty of choosing the discovery method it uses in providing discovery.

<u>Final demand.</u>

By way of this letter, we hereby make our final request and demand that BMS immediately identify a witness or witnesses to represent BMS in the 30(b)(6) deposition and provide us with possible dates for the deposition which are not later than April 6 on which we may begin the deposition.

March 23, 2007
Page 5

<u>Conclusion</u>

We are available telephonically to see if the parties can resolve this before the hearing.
Please feel free to contact me if you have any questions or concerns.

Very truly yours,

Meghan Ashley Wharton
Perkins Coie LLP

cc: Phil Rovner, Esq.

# EXHIBIT 4



101 Jefferson Drive
Menlo Park, CA 94025-1114
PHONE 650.838.4300
FAX 650.838.4350
www.perkinscoie.com

Meghan Ashley Wharton
PHONE (650) 838-4363
FAX (602) 648-7038
EMAIL MWharton@perkinscoie.com

April 11, 2007

**Via E-mail and U.S. mail**

Christopher P. Borello
Fitzpatrick, Cella, Harper & Scinto
30 Rockefeller Plaza
New York, New York 10112-3801

Re:   *Zymogenetics, Inc. v. Bristol-Myers Squibb Co.*, Civil Action No. C06-500

Dear Christopher:

        We write to again address (a) certain deficiencies in Bristol-Myers Squibb, Co.'s ("BMS") responses to Zymogenetics, Inc.'s ("Zymogenetics") First Set of Interrogatories ("Interrogatories"), and (b) the depositions to occur pursuant to Zymogenetics, Inc.'s Amended Notice of Deposition of Defendant Bristol-Myers Squibb Co. Pursuant to Fed. R. Civ. P. 30(b)(6) ("Deposition Notice").

**Responses to Interrogatories**

        In your letter dated March 27, 2007, you stated that BMS would provide Zymogenetics supplemental responses to certain Interrogatories. Zymogenetics is pleased that BMS has finally agreed to supplement its responses to Zymogenetics Interrogatories Nos. 1 and 2. However, you did not indicate when BMS would be providing the supplemental responses. Zymogenetics served its Interrogatories more than five months ago (October 31, 2006) and BMS has continuously delayed responding to the Interrogatories. Therefore, Zymogenetics hereby requests that BMS respond to Interrogatories Nos. 1 and 2 not later than April 16, 2007.

        Zymogenetics hereby accepts BMS' offer in your March 27, 2007 letter to comply with the provisions of Rule 33(d) in exchange for Zymogenitics' agreement to do the same. Therefore, Zymogenetics agrees to identify documents from which the answers to BMS Interrogatories Nos. 4(a), 4(b), 4(c) and 5 can be derived or ascertained not later than April 27, 2007. As such, Zymogenetics hereby requests that BMS identify documents from which the answers to Zymogenetics Interrogatories Nos. 5, 6, 7, 8, 9, 10 and 12 can be derived or ascertained not later than April 27, 2007.

Christopher P. Borello
Fitzpatrick, Cella, Harper & Scinto
April 11, 2007
Page 2

In response to your continued refusal to respond to Interrogatory No. 14, Zymogenetics hereby narrows the Interrogatory as follows:

14.   *Identify all persons having knowledge of the facts that support your admissions, denials and/or contentions contained in paragraphs 3, 6, 7, 10, 11, 13, 14, 16, 17, 19, 20, 22-25, 33-37 and 40-45 of your Answer and Counterclaims and, for each such person, state the entire factual basis for that person's knowledge.*

## Rule 30(b)(6) Deposition

### BMS intent to provide 30(b)(6) witnesses one time only.

Zymogenetics is entitled to depose any person designated as a BMS Rule 30(b)(6) witness in a second subsequent deposition for the purpose of questioning that individual as a fact witness in this matter.

### Information regarding BMS activities outside the United States

As a general matter, Zymogenetics is entitled to all information and testimony regarding BMS activities outside of the United States where the BMS activity involved or involves either (a) the manufacture of Orencia in the United States and exported to another country, and (b) the manufacture of Orencia outside the United States for the subsequent importation into the United States. Attached hereto is a chart identifying the non-United States information Zymogenetics is entitled to in response to each of our 30(b)(6) deposition topics.

### Information beyond the filing date of the of the Complaint.

In response to the request in your March 27, 2007 letter that Zymogenetics provide BMS with a list of topics for which Zymogenetics wants information beyond the filing date of the Complaint, it is Zymogenetics' position that it is not required to provide such a list. During our meet and confer, you asserted that there was an agreement between counsel in this matter to permit the parties to not produce, disclose or provide testimony regarding all documents and information covering the period after the filing of the Complaint. It is my understanding that no such agreement was ever made nor would we have made such an agreement. Therefore, Zymogenetics is entitled to documents and testimony regarding all non-privileged information beyond the filing date of the Complaint.

Christopher P. Borello
Fitzpatrick, Cella, Harper & Scinto
April 11, 2007
Page 3

<u>Proposed date for 30(b)(6) Deposition Topic Nos. 6-11 and 25</u>

As I indicated in my email dated April 5, 2007, the depositions on April 24, 2007 and April 27, 2007 proposed in your March 27, 2007 letter are acceptable. At this time, we are unable to confirm our availability on May 4, 2007. We are happy to do the depositions at your offices in New York, New York starting at 9:30 a.m. Please let me know if that is acceptable.

<u>Topic No. 1</u>

In response to your continued refusal to provide BMS 30(b)(6) witness testimony for Topic 1 of the Deposition Notice, Zymogenetics hereby narrows the Topic as follows:

> 1.     *The organizational structure of any department, division or subsidiary of Bristol-Myers involved in the creation, development, testing, manufacture, marketing, selling and licensing of Orencia.*

<u>Topic 12</u>

Your continued refusal to provide testimony for Topic 12 is unacceptable. In addition to the production of the actual licenses, Zymogenetics is entitled BMS 30(b)(6) witness testimony relating to the negotiations of all licenses involving Orencia and/or CTLA4Ig including, but not limited to the identity of all non-lawyer participants in those negotiations. As such, we hereby request that BMS provide BMS 30(b)(6) testimony regarding Topic 12. Should you fail to make arrangements for a deposition(s) covering Topic 24 by April 23, 2007 (with the deposition to occur prior to May 31, 2007), we will have no choice but to contact the Court regarding this topic.

<u>Topic 14</u>

Your continued refusal to provide testimony for Topic 14 is also unacceptable. We refuse to narrow this topic and feel that we are clearly entitled to testimony regarding non-privileged communications referring or relating to the patents-in-suit. Such communications relate to numerous issues presented in this litigation such as BMS' knowledge of the patents and any BMS analysis of the patents. As such, we hereby request that BMS provide BMS 30(b)(6) testimony regarding Topic 14. Should you fail to make arrangements for a deposition(s) covering Topic 14 by April 23, 2007 (with the deposition to occur prior to May 31, 2007), we will have no choice but to contact the Court regarding this matter.

Christopher P. Borello
Fitzpatrick, Cella, Harper & Scinto
April 11, 2007
Page 4

Topic 19

Zymogenetics is entitled BMS 30(b)(6) witness testimony relating to all disputes relating to Orencia and/or CTLA4Ig.  However, in the interest of compromise, if BMS will confirm in writing that the litigation involving the Repligen Corporation is the only action falling within the scope of Topic 19 and relating to Orencia and/or CTLA4Ig, Zymogenetics will agree not to seek further BMS 30(b)(6) testimony regarding this topic.  Should you fail to make such written confirmation by April 23, 2007, we will have no choice but to contact the Court regarding this topic.

Topic 23

Your continued refusal to provide testimony for Topic 24 is unacceptable.  It is highly unlikely that the only communications involving BMS and relating to this litigation are subject to the attorney-client privilege or were made to the SEC.  For example, it is highly unlikely that each and every communications between and among BMS management and/or employees is protected by the attorney-client privilege.  To the extent such communications are not privileged, Zymogenetics is entitled to related BMS 30(b)(6) testimony.  As such, we hereby request that BMS provide BMS 30(b)(6) testimony regarding Topic 24.  Should you fail to make arrangements for a deposition(s) covering Topic 24 by April 23, 2007 (with the deposition to occur prior to May 31, 2007), we will have no choice but to contact the Court regarding this matter.

Topic 24

Your continued refusal to provide testimony for Topic 24 is unacceptable.  The fact that a similar interrogatory exists regarding this topic does not foreclose Zymogenetics' ability to seek BMS 30(b)(6) testimony on this topic.  As such, we hereby request that BMS provide BMS 30(b)(6) testimony regarding Topic 24.  Should you fail to make arrangements for a deposition(s) covering Topic 24 by April 23, 2007 (with the deposition to occur prior to May 31, 2007), we will have no choice but to contact the Court regarding this matter.

Topics not addressed in correspondence.

In your Deposition Notice Response, you agreed to provide a witness(s) to testify regarding topics 2-5.  Please advise when BMS expects to provide witnesses to testify regarding Topics 2-5.  Should you fail to make arrangements for a deposition(s) covering Topics 2-5 by April 23, 2007 (with the deposition to occur prior to May 31, 2007), we will have no choice but to contact the Court regarding this matter.

Christopher P. Borello
Fitzpatrick, Cella, Harper & Scinto
April 11, 2007
Page 5

## Conclusion

    We are available telephonically to see if the parties can resolve this before the hearing. Please feel free to contact me if you have any questions or concerns.

        Very truly yours,

        Meghan Ashley Wharton
        Perkins Coie LLP

cc: Phil Rovner, Esq.

Zymogenetics, Inc. v. Bristol-Myers Squibb Co.

**Rule 30(b)(6) Deposition Topics – Information regarding BMS activities outside the United States**

| Topic Number | Non-United States Information |
|---|---|
| 5 | (a) information relating to the manufacture of Orencia in the United States and exported to another country; (b) information relating to the manufacture of Orencia in a country other than the United States and imported to the United States. |
| 6 | (a) information relating to the sale and offer for sale of Orencia that is manufactured in the United States and exported to another country; and (b) information relating to the sale and offer for sale of Orencia that is manufactured outside the United States and imported into the United States. |
| 7 | (a) information relating to sales (actual and projected) of Orencia that is manufactured in the United States and exported to another country; and (b) information relating to sales (actual and projected) of Orencia that is manufactured outside the United States and imported into the United States. |
| 8 | (a) marketing information for Orencia that is manufactured in the United States and exported to another country; and (b) marketing information for Orencia that is manufactured outside the United States and imported into the United States. |
| 9 | (a) costs for sale, marketing, manufacture, design and development for Orencia that is manufactured in the United States and exported to another country; and (b) costs for sale, marketing, manufacture, design and development for Orencia that is manufactured outside the United States and imported into the United States. |
| 10 | (a) gross and net profits for the sale of Orencia that is manufactured in the United States and exported to another country; and (b) gross and net profits for the sale of Orencia that is manufactured outside the United States and imported into the United States. |
| 11 | (a) marketing, pricing, placement, packaging and promotion of Orencia that is manufactured in the United States and exported to another country; and (b) marketing, pricing, placement, packaging and promotion of Orencia that is manufactured outside the United States and imported into the United States. |

| Topic Number | Non-United States Information |
|---|---|
| 12 | (a) licenses referring or relating to Orencia that is manufactured in the United States and exported to another country; and (b) licenses referring or relating to Orencia that is manufactured outside the United States and imported into the United States. |
| 19 | (a) all other lawsuits, mediations, arbitrations, or negotiations or prospective lawsuits, mediations, arbitrations, or negotiations with regard to Orencia that is manufactured in the United States and exported to another country; and (b) all other lawsuits, mediations, arbitrations, or negotiations or prospective lawsuits, mediations, arbitrations, or negotiations with regard to Orencia that is manufactured outside the United States and imported into the United States. |

# EXHIBIT 5

# THIS EXHIBIT HAS BEEN REDACTED IN ITS ENTIRETY

# EXHIBIT 6

**From:** Borello, Christopher [mailto:CBorello@fchs.com]
**Sent:** Thursday, August 30, 2007 12:03 PM
**To:** Wharton, Meghan (Perkins Coie)
**Cc:** Cottrell@RLF.com; Farnan@RLF.com; Tracy,Colleen
**Subject:** Re: ZymoGenetics - Topic 18 of 30(b)(6) Deposition Notice

Meghan,

This is in response to your e-mail below concerning reliance on opinions of counsel, to the extent that any exist.

Bristol cannot make such a determination prior to the construction of claim terms and the disclosure of expert reports. Bristol will disclose reliance on opinions of counsel, to the extent that any exist, after the claims are construed.

Regards,
Chris


-----Original Message-----
From: Wharton, Meghan (Perkins Coie)
To: Borello, Christopher
Sent: Thu Aug 02 16:03:29 2007
Subject: ZymoGenetics - Topic 18 of 30(b)(6) Deposition Notice

Chris

Topic 18 of ZymoGenetic's 30(b)(6) deposition notice to Bristol-Myers in part requested that Bristol-Myers provide 30(b)(6) testimony regarding any opinions of counsel obtained by Bristol-Myers regarding infringement and/or validity of the patents-in-suit. Bristol-Myers declined to provide the requested testimony and stated that "[t]o the extent that Bristol decided to rely on any such information to rebut a willful infringement claim and to the extent that such information exists, Bristol will reevaluate providing a witness to testify regarding this topic." ZymoGenetics hereby requests that Bristol-Myers notify counsel for ZymoGenetics prior to August 30, 2007 if Bristol-Myers will rely on any opinion(s) of counsel to rebut ZymoGenetics' willful infringement claim and whether or not Bristol-Myers agrees to provide 30(b)(6) testimony regarding such opinions.

Meghan

*******************************************************************
Meghan Ashley Wharton | Perkins Coie LLP
101 Jefferson Drive
Menlo Park, California 94025-1114
Phone: (650) 838 - 4363
Cell: (650) 346-4771
Fax: (650) 838 - 4350
Email: mwharton@perkinscoie.com
www.perkinscoie.com <file://www.perkinscoie.com>

*******************************************************************

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

-------- This email message and any attachments are intended for the use of the addressee(s) indicated above. Information that is privileged or otherwise confidential may be contained therein. If you are not the intended recipient(s), you are hereby notified that any dissemination, review or use of this message, documents or information contained therein is strictly prohibited. If you have received this message in error, please immediately delete it and notify us by telephone at (212) 218-2100. Thank you.

# EXHIBIT 7



101 Jefferson Drive
Menlo Park, CA 94025-1114
PHONE 650.838.4300
FAX 650.838.4350
www.perkinscoie.com

Meghan Ashley Wharton
PHONE (650) 838-4363
FAX (602) 648-7038
EMAIL MWharton@perkinscoie.com

August 30, 2007

**VIA ELECTRONIC MAIL AND FIRST CLASS MAIL**

Christopher P. Borello
Fitzpatrick, Cella, Harper & Scinto
30 Rockefeller Plaza
New York, New York 10112-3801

Re: **ZymoGenetics, Inc. v. Bristol-Myers Squibb Co., Civil Action No. C06-500**

Dear Chris,

This letter is in response to your August 30, 2007 email regarding opinions of counsel. Bristol-Myers' position regarding the disclosure of opinions of counsel and related testimony is not acceptable. The Federal Rules of Civil Procedure require that all factual evidence that a party may rely on to support a claim or defense be disclosed during the time established by the Court for fact discovery. Any opinion of counsel that Bristol-Myers may rely on to support its defense to ZymoGenetics' willful infringement claim must be disclosed during fact discovery. Disclosure of such opinions by Bristol-Myers after the close of fact discovery will prejudice ZymoGeneitcs because ZymoGenetics will be unable to conduct discovery regarding the disclosed opinion and Bristol-Myers' reliance on the opinion. As such, ZymoGenetics will consider Bristol-Myers' failure to raise opinions of counsel during fact discovery as an explicit waiver of its right to assert reliance on opinion of counsel as a defense to ZymoGenetics' willful infringement claim in the present litigation.

Bristol-Myers' statement that it cannot make a determination until after construction of the claim terms and disclosure of expert reports is not persuasive. Any opinion of counsel asserted by Bristol-Myers in support of its willful infringement defense, the circumstances surrounding the drafting of the opinion and Bristol-Myers' subsequent reliance on that opinion are factual matters unaffected by the parties' expert disclosures and the Court's future construction of the claim terms. Bristol-Myers does not need claim construction and/or expert disclosures to determine whether or not an opinion of counsel created by counsel and interpreted by Bristol-Myers without the benefit of these items serves as a defense to ZymoGenetics' willful infringement contention.

Very truly yours,

Meghan Ashley Wharton

30461-7004/LEGAL13523995.1

ANCHORAGE · BEIJING · BELLEVUE · BOISE · CHICAGO · DENVER · LOS ANGELES  MENLO PARK
OLYMPIA · PHOENIX · PORTLAND · SAN FRANCISCO · SEATTLE · SHANGHAI · WASHINGTON, D.C.

Perkins Coie LLP and Affiliates

# EXHIBIT 8

## FITZPATRICK, CELLA, HARPER & SCINTO
### 30 ROCKEFELLER PLAZA
### NEW YORK, NY 10112-3800
### 212-218-2100
FACSIMILE (212) 218-2200
WWW.FITZPATRICKCELLA.COM

WASHINGTON OFFICE
975 F STREET, N.W.
WASHINGTON, D.C. 20004-1405
(202) 530-1010
FACSIMILE (202) 530-1055

CALIFORNIA OFFICE
650 TOWN CENTER DRIVE, SUITE 1600
COSTA MESA, CALIFORNIA 92626-7130
(714) 540-8700
FACSIMILE (714) 540-9823

CHRISTOPHER P. BORELLO
DIRECT DIAL (212) 218-2574
E-MAIL cborello@fchs.com

September 10, 2007

<u>By E-Mail</u>

Meghan Ashley Wharton, Esq.
PERKINS COIE LLP
101 Jefferson Drive
Menlo Park, CA 94025-1114

Re:     *ZymoGenetics, Inc. v. Bristol-Myers Squibb Co.*
        <u>Civil Action No. 06-500-***</u>

Dear Meghan:

This letter serves to follow up on our discussion last week concerning disclosure of opinions of counsel after the close of fact discovery. As discussed, Bristol will agree to allow additional discovery concerning opinions of counsel, to the extent that any opinions exist, after the identification of reliance on opinions of counsel. Therefore, disclosure after the close of fact discovery will not prejudice ZymoGenetics, and will not be a waiver of Bristol's right to rely on opinions of counsel.

Sincerely,

Christopher P. Borello

FCHS_WS 1540484v1

# EXHIBIT 9

RICHARDS, LAYTON & FINGER
A PROFESSIONAL ASSOCIATION
ONE RODNEY SQUARE
920 NORTH KING STREET
WILMINGTON, DELAWARE 19801
(302) 651-7700
FAX: (302) 651-7701
WWW.RLF.COM

FREDERICK L. COTTRELL, III
DIRECTOR

DIRECT DIAL NUMBER
302-651-7509
COTTRELL@RLF.COM

October 15, 2007

**VIA E-FILING**

The Honorable Mary Pat Thynge
United States Magistrate Judge
U.S. District Court for the District of Delaware
J. Caleb Boggs Federal Building
844 N. King Street
Wilmington, DE 19801

Re:    **ZymoGenetics, Inc. v. Bristol-Myers Squibb Co.**
       **Civil Action No. 06-500-***__

Dear Magistrate Judge Thynge:

As discussed during the conference call on October 4, 2007, Defendant Bristol-Myers Squibb Company ("Bristol") respectfully submits this letter memorandum in support of its request to bifurcate the issues of willfulness (including discovery related thereto) and any potential enhanced damages stemming from willfulness.[1] Bifurcation of willfulness is appropriate because a decision to waive the attorney-client privilege should be made only when absolutely necessary, and therefore should be made after a decision on the merits concerning infringement is rendered. Such an approach is consistent with the Federal Circuit's new willfulness test. Bifurcation will also minimize the risk of prejudice to Bristol, the risk of juror confusion, will promote judicial economy, and will

---

[1]    Of course, the bifurcated discovery and trial will not be necessary to the extent that the patents-in-suit are found invalid or a finding of noninfringement is made.

RLF1-3212384-1

The Honorable Mary Pat Thynge
October 15, 2007
Page 2

not prejudice ZymoGenetics. For the reasons set forth in this letter, Bristol respectfully

requests that the Court bifurcate willfulness.

I.    **The Current State Of Willfulness Law**

In 1983, the Federal Circuit established a standard for evaluating willful

infringement which placed an affirmative duty on potential infringers to exercise due care

in determining whether or not activities are infringing, and to seek advice of counsel

before initiating potentially infringing activities. *Underwater Devices, Inc. v. Morrison-*

*Knudsen Co*, 717 F.2d 1380, 1389-90 (Fed. Cir. 1983), *overruled by In re Seagate*

*Technology, LLC* ("*Seagate*"), Misc. Docket No. 830, 2007 U.S. App. LEXIS 19768, at

*14-15, 22 (Fed. Cir. August 20, 2007) (*en banc*). Until the Federal Circuit *Knorr-*

*Bremse* decision in 2004, failure to rely on or produce an opinion of counsel allowed the

fact-finders to draw negative inferences against accused infringers.[2]  *Id.* at *17-18. In

light of the affirmative duty, accused infringers commonly asserted an advice of counsel

defense. *Id.* at *16.

*Seagate* not only did away with the affirmative duty, it created a threshold test

that should be met prior to delving into the subjective mind of the accused infringer. *Id.*

at *19-25. That is, *Seagate* created a prerequisite that should serve as a hurdle to a

patentee's access to an accused infringer's attorney-client privileged material:

> . . . to establish willful infringement, a patentee must show by clear and
> convincing evidence that the infringer acted despite an objectively high
> likelihood that its actions constituted infringement of a valid patent. The

---

[2]    The *Knorr-Bremse* decision concluded that this negative inference
"imposed 'inappropriate burdens on the attorney-client relationship.'" *Id.* at *17-18
(citing *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337
(Fed. Cir. 2004)(*en banc*)).

The Honorable Mary Pat Thynge
October 15, 2007
Page 3

> state of mind of the accused infringer is not relevant to this objective
> inquiry. *If this threshold objective standard is satisfied,* the patentee
> must also demonstrate that this objectively-defined risk (determined by the
> record developed in the infringement proceeding) was either known or so
> obvious that it should have been known to the accused infringer.

*Id.* at *22-23 (emphasis added, citations omitted).

This new two-part willfulness test must be proven by clear and convincing
evidence. *Id.* Advice of counsel is not relevant to the first part of the test, the threshold
objective element. The second part of the test, the subjective element, requires patentees
to prove that the objectively-defined risk "was either known or so obvious that it should
have been known to the accused infringer." *Id.* It is during the analysis of the subjective
element that advice of counsel becomes relevant.

As advice of counsel is only relevant to the subjective element, it is only <u>after</u> the
patentee meets the threshold objective element that an accused infringer should be
required to elect to rely on advice of counsel, thereby waiving some degree of attorney-
client privilege.[3] This is consistent with the concurring opinion authored by Judge
Gajarsa and joined by Judge Newman. Judge Gajarsa gave his own interpretation of the
two-part willfulness test, which he believed was consistent with the majority opinion.
*Seagate* at *59-60. Judge Gajarsa stated:

> If Convolve is unable to show [the objective element], Seagate cannot be found to
> have willfully infringed, regardless of any evidence of its subjective beliefs. . . .
> Thus, Seagate's subjective beliefs may become relevant only if Convolve
> successfully makes this showing of objective unreasonableness. . . . <u>Because no</u>
> <u>finding of objective unreasonableness has yet been made in this case, issues of</u>
> <u>attorney-client privilege and work product may not even need to be confronted.</u>

---

[3]    As the first part of the willfulness test is an objective analysis, it is
reasonable to assume that the claims should be construed properly prior to performing the
analysis.

The Honorable Mary Pat Thynge
October 15, 2007
Page 4

*Id.* at *60-61 (emphasis added). Therefore, bifurcation of willfulness until after

infringement is proven is consistent with *Seagate*.

II.    **A Finding of Willfulness Under the**
       **Facts of the Present Case Would Be Extremely Remote**

       In the present case, the possibility of a finding of willfulness is extremely remote.

As the Federal Circuit stated in *Seagate*, a substantial question about validity is likely

sufficient to avoid a charge of willfulness based on post-filing conduct (i.e., the conduct

of an accused infringer after the filing of a complaint). *Id.* at *31. The same should hold

true to avoid a charge of willfulness based on prelitigation conduct. Here, ZymoGenetics

should not be permitted to deny that there was a substantial question concerning validity

during much of the relevant prelitigation time period, as ZymoGenetics itself made

representations to the United States Patent and Trademark Office ("USPTO") that there

were such substantial questions of patentability.

       For example, in March of 2004, ZymoGenetics told the USPTO in Requests for

Reexamination that there were "substantial questions of patentability" with respect to

both of the patents involved in this litigation.[4]  Until August 29, 2006 -- after

ZymoGenetics filed the present lawsuit -- the '725 patent was involved in a

reexamination proceeding that was granted pursuant to ZymoGenetics' patentability

---

[4]    Regarding United States Patent No. 5,843,725 ("the '725 patent"),
ZymoGenetics stated "[t]he disclosures of the following seven U.S. patents and articles
raise a substantial question of patentability for each of the 49 claims of the '725 patent
under 35 U.S.C. §102(b), §102(e), §102(g) and/or §103(a) . . . ." (Exh. 1 at ZG001666).
Similarly, regarding the United States Patent No. 6,018,026 ("the '026 patent"),
ZymoGenetics stated "[t]he disclosures of the following seven U.S. patents and articles
raise a substantial question of patentability for each of the 29 claims of the '026 patent
under 35 U.S.C. §102(b), §102(e), §102(g) and/or §103(a) . . . ." (Exh. 2 at ZG000754).

The Honorable Mary Pat Thynge
October 15, 2007
Page 5

representations. The '026 patent was involved in a similar reexamination proceeding
until July 4, 2006 -- about a month before the present lawsuit was filed. Therefore, it
would seem extremely unlikely that willfulness could be found based on prelitigation
conduct -- especially in light of the fact that the claims of both patents were modified
during reexamination -- as the relevant prelitigation time period was about a month.[5]
With respect to willfulness based on post-filing conduct, a patentee who does not move
for a preliminary injunction should not be allowed to accrue enhanced damages based
solely on the accused infringer's post-filing conduct. *Id.* at 30. This lawsuit was filed
more than a year ago, and ZymoGenetics elected not to seek a preliminary injunction.
Therefore, ZymoGenetics should be barred from accruing any alleged enhanced damages
based on post-filing conduct.

## III.    <u>Bifurcation Is Appropriate In This Case</u>

Bifurcation is governed by Federal Rule of Civil Procedure 42(b), which

provides, in pertinent part, as follows:

> The court, in furtherance of convenience or to avoid prejudice, or when
> separate trials will be conducive to expedition and economy, may order a
> separate trial of any claim . . . or of any separate issue . . . or issues,
> always preserving inviolate the right of trial by jury as declared by the
> Seventh Amendment to the Constitution or as given by a statute of the
> United States.

Fed. R. Civ. P. 42(b). "Courts when exercising their broad discretion to bifurcate issues

for trial under Rule 42(b), should consider whether bifurcation will avoid prejudice,

---

[5]     "[A] willfulness claim asserted in the original complaint must necessarily
be grounded exclusively in the accused infringer's pre-filing conduct. By contrast, when
an accused infringer's post-filing conduct is reckless, a patentee can move for a
preliminary injunction, which generally provides an adequate remedy for combating post-
filing willful infringement." *Id.* at *30.

The Honorable Mary Pat Thynge
October 15, 2007
Page 6

conserve judicial resources, and enhance juror comprehension of the issues presented in the case." *Ciena Corp. v. Corvis Corp*, 210 F.R.D. 519, 520 (D. Del. 2002), 210 F.R.D. at 520. Here, each of the factors favor bifurcation.

A necessary consequence of seeking to rely on advice of counsel to rebut willfulness is that the accused infringer waives attorney-client privilege and is thus forced to produce not only the opinion letter itself but some degree of attorney-client privileged information without knowing whether making such an election was necessary. That is, waiver is not necessary if ZymoGenetics fails to prove infringement or Bristol proves invalidity. This prejudice will be avoided if the Court bifurcates willfulness.

*Seagate* itself encourages courts to consider bifurcation of willfulness:

> ... an accused infringer "should not, without the trial court's careful consideration, be forced to choose between waiving the privilege in order to protect itself from a willfulness finding, in which case it may risk prejudicing itself on the question of liability, and maintaining the privilege, in which case it may risk being found to be a willful infringer if liability is found." We advised that <u>in camera</u> review and bifurcating trials in appropriate cases would alleviate these concerns.

*Seagate* at \*17 (internal citations omitted)(quoting *Quantum Corp. v. Tandon Corp.*, 940 F.2d 642, 643-44 (Fed. Cir. 1991)). Bifurcating willfulness will alleviate the concerns highlighted by the Federal Circuit. And, in evaluating bifurcation, "a district court has broad discretion in separating issues and claims for trial as part of its wide discretion in trial management." *Ciena Corp.* at 520 (internal quotations and citation omitted).

On the other hand, there is no prejudice to ZymoGenetics if the Court grants bifurcation. There has been no fact discovery to date regarding opinions of counsel.

The Honorable Mary Pat Thynge
October 15, 2007
Page 7

Such discovery is not relevant to infringement or validity. And, ZymoGenetics will be permitted an opportunity to obtain such discovery before willfulness is tried.

Because infringement is a strict liability offense, the state of mind of the accused infringer is irrelevant. *Seagate* at *12. Injecting the state of mind of the accused infringer and recklessness into the jury's analysis when trying willfulness and liability together creates a risk of juror confusion.

Whether or not alleged infringement is "willful" is only relevant in determining whether enhanced damages are warranted. *Seagate* at *12.[6] Bifurcation will minimize unnecessary discovery and will therefore conserve judicial resources should the patents be found invalid or Bristol be found not to infringe during the liability portion of the case.

## CONCLUSION

For all of the foregoing reasons, Bristol respectfully requests that the Court bifurcate discovery and trial on Bristol's alleged infringement of the patents-in-suit and damages from a trial on willful infringement.

Respectfully,

Frederick L. Cottrell, III (#2555)

FLCIII/th
Encl.
cc:    Clerk of the Court (via e-filing)
       Philip A. Rovner, Esq. (via e-filing and hand delivery)
       Meghan A. Wharton, Esq. (via e-filing and e-mail)

---

[6]    "[A] finding of willfulness does not require an award of damages; it merely permits it." *Id.* at 13.

RLF1-3212384-1

# EXHIBIT 1

PATENT

IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | | |
|---|---|---|
| In re Patent Of: | Andrzej Z. Sledziewski et al. | Atty. Docket No.: 985.011USX |
| Patent No. | 5,843,725 | |
| Issued: | December 1, 1998 | |
| Title: | METHODS OF PRODUCING SECRETED RECEPTOR ANALOGS AND BIOLOGICALLY ACTIVE DIMERIZED POLYPEPTIDE FUSIONS | |

REQUEST FOR REEXAMINATION UNDER
35 U.S.C. §302 AND 37 C.F.R. §1.510

MS EX PARTE REEXAM
Commissioner for Patents
P. O. Box 1450
Alexandria, VA 22313-1450

In accord with 37 C.F.R. §1.510, the Patent Owner, ZymoGenetics, Inc. (hereinafter ZymoGenetics), requests reexamination of all claims of U.S. Patent No. 5,843,725 (hereinafter the '725 patent, attached as Exhibit A). This request is filed within the period of enforceability of the '725 patent and is accompanied by the fee set forth in 37 C.F.R. §1.20(c). The '725 patent contains sequence listings which are on file in computer-readable form in the official file for U.S. Patent No. 5,843,725.

ZymoGenetics is also filing a reexamination request for related U.S. Patent No. 6,018,026.

## I.      STATEMENT UNDER 37 C.F.R. §1.510(b)(1)

The disclosures of the following seven U.S. patents and articles raise a substantial question of patentability for each of the 49 claims of the '725 patent under 35 U.S.C. §102(b), §102(e), §102(g) and/or §103(a), because there is a substantial likelihood that a reasonable Examiner would consider the patents and articles important in deciding whether or not these claims are patentable (M.P.E.P. §2242):

U.S. Patent No. 5,336,603 (" '603 Capon");

U.S. Patent No. 5,565,335 (" '335 Capon");

U.S. Patent No. 6,004,781 (" '781 Seed");

Gascoigne et al., *Proc. Natl. Acad. Sci. USA* 84:2936-2940, 1987 ("Gascoigne");

Traunecker et al., *Nature* 331:84-86, 1988 ("Traunecker");

ZG 001666

Ellis et al., *Proc. Natl. Acad. Sci. USA* 83:8137-8141, 1986 ("Ellis");

Riedel et al., *Science*, 236:197-200, (April 1987) ("Riedel").

Notwithstanding this Statement, Zymogenetics believes that each and every claim of the
'725 patent is distinguishable over these cited U.S. patents and articles.

## II.    SUMMARY AND IDENTIFICATION UNDER 37 C.F.R. §1.510 (b)(2)

The claims of the '725 patent are directed to methods for producing a secreted dimerized
polypeptide fusion (claims 1-20), a secreted receptor analog (claims 21-27), a secreted PDGF
receptor analog (claim 28) or a secreted multimerized polypeptide fusion (claims 29-49). The
methods involve introducing into a eukaryotic host cell one or more DNA constructs encoding
the polypeptide chains of the "polypeptide fusion" or "receptor analog", growing the host cell
and isolating the dimerized or multimerized polypeptide fusion or receptor analog. In addition to
encoding the polypeptide chains, the DNA constructs also include a transcriptional promoter and
a secretory signal sequence. Each chain of the "dimerized or multimerized polypeptide fusion"
comprises a "non-immunoglobulin polypeptide" requiring "dimerization" or "multimerization"
for "biological activity" joined to a "dimerizing or multimerizing protein heterologous to said
non-immunoglobulin polypeptide". Examples of methods for producing such fusions  include
methods for producing a ligand binding polypeptide, as the non-immunoglobulin polypeptide,
fused to an immunoglobulin constant domain polypeptide as the dimerizing protein, and methods
for producing a PDGF receptor analog wherein the non-immunoglobulin polypeptide is a PDGF
receptor sequence of SEQ ID No. 36 joined to an immunoglobulin heavy chain constant region.
The fusion is useful in assay, diagnostic and pharmaceutical treatment applications.

The claims of the '725 patent are provided in the attached copy of the '725 patent. The
independent claims can be summarized as follows. These summaries are for illustration
purposes only and are not to be regarded as statements about the terms of these claims. The
claim terms are completely and fully set forth in the '725 patent.

## A.    CLAIM 1 OF THE '725 PATENT

Claim 1 is directed to a method for producing a secreted, active dimerized polypeptide
fusion. The method includes introducing a DNA construct encoding a dimerizing polypeptide

ZG 001667

REQUEST FOR REEXAMINATION UNDER 35 U.S.C. §302 AND 37 C.F.R. §1.510          Page 3
U.S. Patent No. 5,843,725
Title: METHODS OF PRODUCING SECRETED RECEPTOR ANALOGS AND
BIOLOGICALLY ACTIVE DIMERIZED POLYPEPTIDE FUSIONS

fusion into a host cell, growing the cell and isolating the dimerized polypeptide fusion. The
DNA construct includes, in part, a DNA sequence encoding a polypeptide chain comprising a
non-immunoglobulin polypeptide joined to a dimerizing protein heterologous to the non-
immunoglobulin polypeptide.

B.    CLAIM 9 OF THE '725 PATENT

Claim 9 is directed to a method similar to that of claim 1 except that the DNA construct is
a first DNA construct that encodes an immunoglobulin light chain constant region as the
dimerizing protein, and a second DNA construct is also introduced into the host cell, which
comprises in part a second DNA sequence encoding an immunoglobulin heavy chain constant
region domain selected from a certain group and optionally encoding an immunoglobulin hinge
or variable region.

C.    CLAIM 15 OF THE '725 PATENT

Claim 15 is directed to a method similar to that of claim 9 except that the first DNA
construct encodes an immunoglobulin heavy chain constant region domain as the dimerizing
protein, and the second DNA construct includes in part a second DNA sequence encoding an
immunoglobulin light chain constant region and optionally encoding an immunoglobulin
variable region.

D.    CLAIM 21 OF THE '725 PATENT

Claim 21 is directed to a method for producing a secreted receptor analog. The method
includes the steps of introducing into a eukaryotic host cell a DNA construct encoding the
receptor analog, growing the host cell and isolating the receptor analog from the host cell. The
DNA construct comprises, in part, a DNA sequence encoding the receptor analog, which is a
ligand-binding domain of a receptor requiring dimerization for biological activity joined to a
dimerizing protein heterologous to the ligand-binding domain, and optionally an
immunoglobulin hinge or variable region joined to the dimerizing protein.

ZG 001668

REQUEST FOR REEXAMINATION UNDER 35 U.S.C. §302 AND 37 C.F.R. §1.510  Page 4
U.S. Patent No. 5,843,725
Title: METHODS OF PRODUCING SECRETED RECEPTOR ANALOGS AND
BIOLOGICALLY ACTIVE DIMERIZED POLYPEPTIDE FUSIONS

E. CLAIM 28 OF THE '725 PATENT

 Claim 28 is directed to a method for producing a PDGF receptor analog.  The method is
related to that of claim 15  except that the first DNA sequence encodes a PDGF receptor
sequence as the non-immunoglobulin polypeptide,  the second DNA sequence further encodes a
second PDGF receptor sequence, and the host cell is a rodent myeloma cell.


F. CLAIM 29 OF THE '725 PATENT

 Claim 29 is directed to a method for producing a secreted active multimerized
polypeptide fusion.  The method includes the steps of introducing into a eukaryotic host cell a
DNA construct encoding the multimerized polypeptide fusion, growing the host cell to allow
secretion of the peptide fusion, and isolating the polypeptide fusion.  The DNA construct
comprises, in part, a DNA sequence encoding a non-immunoglobulin polypeptide requiring
multimerization for biological activity joined to a multimerizing protein selected from a group
consisting of an immunoglobulin heavy chain or light chain constant region, and optionally
encoding an immunoglobulin hinge or variable region joined to the  multimerizing protein.


G. CLAIM 37 OF THE '725 PATENT

 Claim 37 is directed to a method for producing a secreted active heteromultimeric
polypeptide fusion.  The method includes the steps of introducing into a eukaryotic host cell first
and second DNA constructs each encoding a polypeptide fusion, growing the host cell to allow
secretion of the polypeptide fusions and isolating the heteromultimeric polypeptide fusion.  The
first DNA construct includes, in part, a first DNA sequence encoding a first polypeptide fusion
comprising a first non-immunoglobulin polypeptide joined to a first multimerizing protein
selected from an immunoglobulin heavy or light chain constant region optionally including an
immunoglobulin hinge or variable region.  The second DNA construct includes, in part, a second
DNA sequence encoding a second polypeptide fusion comprising a second non-immunoglobulin
polypeptide joined to a second multimerizing protein selected from an immunoglobulin heavy or
light chain constant region optionally including an immunoglobulin hinge or variable region.

ZG 001669

REQUEST FOR REEXAMINATION UNDER 35 U.S.C. §302 AND 37 C.F.R. §1.510    Page 5
U.S. Patent No. 5,843,725
Title: METHODS OF PRODUCING SECRETED RECEPTOR ANALOGS AND
BIOLOGICALLY ACTIVE DIMERIZED POLYPEPTIDE FUSIONS

## III.    DETAILED EXPLANATION UNDER 37 C.F.R. §1.510(b)(2)

ZymoGenetics provides the following detailed explanation of the pertinency and manner of applying the foregoing U.S. patents and articles to each claim of the '725 patent.

## A.    SUMMARY OF U.S. PATENTS AND ARTICLES

'603 Capon can be alleged to disclose a method for producing an "immunoadheson" that can be, for example, a fusion protein of the gp120 ligand binding region of the CD4 receptor joined to the constant region of an immunoglobulin. The fusion protein, a nucleic acid encoding the fusion protein, and host cells transformed with the nucleic acid are also allegedly disclosed. Production of multiple immunoadheson polypeptides from a host cell is also allegedly disclosed.

'335 Capon issued out of an application that was filed as a continuation of the application that issued as '603 Capon. Thus, the specifications are believed to be identical.

'781 Seed can be alleged to disclose a method for producing a fusion protein composed of a fragment of CD4 joined to an immunoglobulin light or heavy chain. The CD4 fragment replaces the variable region of the immunoglobulin chain and binds to the envelope protein gp120 of HIV. The fusion protein, a nucleic acid encoding the fusion protein, and host cells transformed with the nucleic acid can also be alleged to be disclosed.

Gascoigne et al. can be alleged to disclose a method for producing a chimeric protein composed of the variable domains of a T-cell receptor joined to the constant region of an immunoglobulin.

Traunecker et al. can be alleged to disclose a method for producing a chimeric protein composed of the extracellular domains of CD4 joined to the constant region of an immunoglobulin light chain.

Ellis et al. can be alleged to disclose a method for producing a hybrid receptor composed of the extracellular domain of the human insulin receptor joined to the transmembrane and cytoplasmic domains of the bacterial aspartate chemoreceptor.

Riedel et al. can be alleged to disclose a method for producing a chimeric receptor composed of the extracellular and transmembrane domains of human epidermal growth factor (EGF) receptor joined to the cytoplasmic domain of avian *erbB* oncogene product.

ZG 001670

### B.    MANNER OF APPLYING THE U.S. PATENTS AND ARTICLES TO THE '725 PATENT CLAIMS

Each of the '603 Capon, '335 Capon and '705 Seed U.S. patents and the Traunecker and Gascoigne articles allegedly disclose methods for producing fusion proteins composed of a ligand binding domain of a receptor joined to heterologous protein domains such as a constant region of an immunoglobulin. These patents and articles allegedly disclose the corresponding fusion protein products as well. Ellis allegedly discloses a method for producing a fusion protein composed of an insulin-binding domain of an insulin receptor joined to an intracellular domain of another receptor. Riedel allegedly discloses a method for producing a chimeric receptor of an EGF binding domain of an EGF receptor joined to an intracellular domain of another protein.

A reasonable Examiner allegedly would find that these U.S. patents and articles disclose features of the claimed methods of the '725 patent. These U.S. patents and articles may be seen to show methods for producing fusion protein chains allegedly similar to those of the '725 patent, namely those composed of ligand binding domains of receptors joined to heterologous protein domains such as the constant regions of immunoglobulins or intracellular domains other than immunoglobulin domains in the case of Ellis and Riedel. The methods for production allegedly include introduction of the appropriate DNA construct into host cells including prokaryotic and eukaryotic cells, and expression of the desired fusion protein. All of the references allegedly disclose such methods.

In particular, the '335 and '603 Capon patents allegedly provide examples of recombinant methods to make fusion proteins having adheson or ligand binding domains joined to immunoglobulin fusion partners. The ligand binding domains allegedly include those of CD1, CD2, CD4, CD8 and CD28 as well as the ligand binding domains of such receptors as the IgE receptor, the PDGF receptor, the CSF-1 receptor and the like. Their immunoglobulin fusion partners allegedly include the light and heavy chain constant and/or variable regions of such immunoglobulins as IgG, IgA, IgE, IgD and IgM. Production of several different fusion proteins by a single host cell are also allegedly described by these patents.

ZG 001671

REQUEST FOR REEXAMINATION UNDER 35 U.S.C. §302 AND 37 C.F.R. §1.510                    Page 7
U.S. Patent No. 5,843,725
Title: METHODS OF PRODUCING SECRETED RECEPTOR ANALOGS AND
BIOLOGICALLY ACTIVE DIMERIZED POLYPEPTIDE FUSIONS

In particular, the '781 Seed patent allegedly discloses a similar fusion protein and a recombinant method to make it. The Seed fusion protein allegedly is an immunoglobulin of the IgM or IgG class having its variable region replaced by the ligand binding domain of CD4, the immune cell surface protein that binds to the envelope protein gp120 of the HIV virus. Similarly, Ellis and Riedel allegedly disclose methods for producing fusion proteins having intracellular domains other than immunoglobulin domains.

When the particulars of these disclosures are compared with the methods and fusion proteins recited by each of the 49 claims of the '725 patent, significant similarities are allegedly apparent. Each of the '725 patent claims recites, with either generic or specific language, a method for production of a fusion protein wherein a host cell is transformed with one or more DNA constructs encoding the fusion protein having a non-immunoglobulin polypeptide (such as a ligand binding domain) and a polypeptide domain heterologous to the non-immunoglobulin polypeptide such as a constant region domain of an immunoglobulin heavy or light chain. This kind of fusion protein and the recombinant method to produce it allegedly echo the fusion proteins, DNA constructs and methods for production disclosed by Capon, Seed, Traunecker, Gascoigne, Ellis and Riedel. For example, the '725 patent exemplifies a PDGF receptor polypeptide (SEQ ID No's 1 and 2) joined to the constant region of an immunoglobulin. The '335 and '603 Capon patents allegedly name this receptor as an example of an adheson joined to an immunoglobulin light or heavy chain constant region.

Consequently, the disclosures of these U.S. patents and articles raise a substantial question of patentability for each claim of the '725 patent. There is a substantial likelihood that a reasonable Examiner would consider these U.S. patents and articles important in deciding whether or not these claims are patentable. A reasonable Examiner would consider this question of patentability and appropriately apply the patent statutes 35 U.S.C. §§102(b), 102(e), 102(g) and/or 103(a) based upon the relevant filing and publication dates of these U.S. patents and articles under consideration. A reasonable Examiner would also investigate the entitlement of such U.S. patents to the filing dates pursuant to the statements of pendency given in the Cross-References to Related U.S. Application Data provided in the U.S. patents, and would investigate the mailing dates of the articles under consideration.

ZG 001672

REQUEST FOR REEXAMINATION UNDER 35 U.S.C. §302 AND 37 C.F.R. §1.510                              Page 8
U.S. Patent No. 5,843,725
Title: METHODS OF PRODUCING SECRETED RECEPTOR ANALOGS AND
BIOLOGICALLY ACTIVE DIMERIZED POLYPEPTIDE FUSIONS

## IV.    CONCLUSION

In view of the above information, ZymoGenetics respectfully requests issuance of an
order for the reexamination of the claims of the '725 patent under 35 U.S.C. §304 and 37 C.F.R.
§1.525. Notwithstanding the question of patentability that has been raised, ZymoGenetics
believes that each and every claim of the '725 patent is distinguishable over the above-cited U.S.
patents and articles, and that upon reexamination of the '725 patent, a certificate of patentability
will be issued.


Respectfully submitted,

ZymoGenetics, Inc.,

By its Representatives,

SCHWEGMAN, LUNDBERG, WOESSNER &
KLUTH, P.A.
P.O. Box 2938
Minneapolis, MN  55402
(612) 373-6939

Date: March 16, 2004                   By _____
                                       A. James Nelson
                                       Reg. No. 28,650

"Express Mail" mailing label number:  EV 299 686 640 US
Date of Deposit: March 16, 2004
This paper or fee is being deposited on the date indicated above with the United States Postal Service pursuant to 37
CFR 1.10, and is addressed to the Commissioner for Patents, Mail Stop Patent Application, P.O. Box 1450,
Alexandria, VA 22313-1450.

ZG 001673

# EXHIBIT 2

PATENT

## IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

| | |
|---|---|
| In re Patent Of: | Andrzej Z. Sledziewski et al.     Atty. Docket No.: 985.012USX |
| Patent No. | 6,018,026 |
| Issued: | January 25, 2000 |
| Title: | BIOLOGICALLY ACTIVE DIMERIZED AND MULTIMERIZED POLYPEPTIDE FUSIONS |

### REQUEST FOR REEXAMINATION UNDER
35 U.S.C. §302 AND 37 C.F.R. §1.510

MS EX PARTE REEXAM
Commissioner for Patents
P. O. Box 1450
Alexandria, VA 22313-14150

     In accord with 37 CFR §1.510, the Patent Owner, ZymoGenetics, Inc. (hereinafter "ZymoGenetics"), requests reexamination of all claims of U.S. Patent No. 6,018,026 (hereinafter the '026 Patent, attached as Exhibit A). This request is filed within the period of enforceability of the '026 patent and is accompanied by the fee set forth in 37 CFR §1.20(c). The '026 patent contains sequence listings which are on file in computer-readable form in the official file for U.S. Patent No. 6,018,026.

     ZymoGenetics is also filing a reexamination request for related U.S. Patent No. 5,843,725.

### I.   STATEMENT UNDER 37 CFR §1.510(b)(1)

     The disclosures of the following seven U.S. Patents and articles raise a substantial question of patentability for each of the 29 claims of the '026 patent under 35 U.S.C. §102(b), §102(e), §102(g) and/or §103(a) because there is a substantial likelihood that a reasonable Examiner would consider these U.S. patents and articles important in deciding whether or not these claims are patentable (M.P.E.P. §2242):

     U.S. Patent No. 5,336,603 ('" '603 Capon");

     U.S. Patent No. 5,565,335 ('" '335 Capon");

     U.S. Patent No. 6,004,781 ('" '781 Seed");

     Gascoigne et al., *Proc. Natl. Acad. Sci. USA* 84:2936-2940, 1987 ("Gascoigne");

     Traunecker et al., *Nature* 331:84-86, 1988 ("Traunecker");

ZG 000754

Ellis et al., *Proc. Natl. Acad. Sci. USA* 83:8137-8141, 1986 ("Ellis");

Riedel et al., *Science*, 236:197-200, (April 1987) ("Riedel").

Not withstanding the Statement, Zymogenetics believes that each and every claim of the '026 patent is distinguishable from these cited U.S. patent and articles.

## II.  SUMMARY AND IDENTIFICATION UNDER 37 C.F.R. §1.510 (b)(2)

The claims of the '026 patent concern a dimerized (claims 1-8) or multimerized (claims 9-29) polypeptide fusion.  Each chain of the dimerized or multimerized fusion contains two joined peptide fragments.  One fragment is a "non-immunoglobulin polypeptide" such as a non-immunoglobulin polypeptide requiring dimerization or multimerization for biological activity and the other is a "dimerizing or multimerizing protein heterologous to said non-immunoglobulin polypeptide".  Some claims specify that the dimerizing or multimerizing protein is a constant region of an immunoglobulin.  An example of the non-immunoglobulin polypeptide is a ligand-binding domain of a cellular receptor such as a platelet-derived growth factor receptor.  An example of the dimerizing protein is the constant region of a heavy chain of an immunoglobulin.  The fusion is useful in assay, diagnostic, and pharmaceutical treatment applications.

The claims of the '026 patent are provided in the attached copy of the '026 patent.  The independent claims can be summarized as follows.  These summaries are for illustration purposes only and are not to be regarded as statements about the terms of these claims.  The claim terms are completely and fully set forth in the '026 patent.

## A.    CLAIM 1 OF THE '026 PATENT

Claim 1 is directed to a biologically active dimerized polypeptide fusion.  The fusion contains first and second chains.  Each of the chains is constructed of a non-immunoglobulin polypeptide joined to a heterologous dimerizing protein.  In particular, claim 1 recites a biologically active, dimerized polypeptide fusion comprising first and second polypeptide chains.  Each of the polypeptide chains comprises a non-immunoglobulin polypeptide requiring dimerization for biological activity joined to a dimerizing protein heterologous to the non-immunoglobulin polypeptide.

REQUEST FOR REEXAMINATION UNDER 35 U.S.C. §302 AND 37 C.F.R. §1.510    Page 3
U.S. Patent No. 6,018,026
Title: BIOLOGICALLY ACTIVE DIMERIZED AND MULTIMERIZED POLYPEPTIDE FUSIONS

B.    CLAIM 9 OF THE '026 PATENT

Claim 9 is directed to a multimerized polypeptide fusion comprising a non-immunoglobulin polypeptide requiring multimerization for bioactivity, joined to an immunoglobulin light chain constant region, and an immunoglobulin heavy chain constant region selected from a certain specific group.

C.    CLAIM 16 OF THE '026 PATENT

Claim 16 is directed to a heteromultimeric polypeptide fusion comprising first and second fusions wherein each comprises a non-immunoglobulin polypeptide joined to a multimerizing protein, wherein the multimerizing proteins are capable of associating to form a multimer.

III.    DETAILED EXPLANATION UNDER 37 CFR §1.510(b)(2)

ZymoGenetics provides the following detailed explanation of the pertinency and manner of applying the foregoing U.S. patents and articles to the claims of the '026 patent.

A.    SUMMARY OF U.S. PATENTS AND ARTICLES

'603 Capon can be alleged to disclose an "immunoadheson" that can be, for example, a fusion protein of the gp120 ligand binding region of the CD4 receptor joined to the constant region of an immunoglobulin. A nucleic acid encoding the fusion protein, host cells transformed with the nucleic acid and methods for treatment using the fusion protein can also be alleged to be disclosed.

'335 Capon issued out of an application that was filed as a continuation of the application that issued as '603 Capon. Thus, the specifications are identical.

'781 Seed can be alleged to disclose a single chain fusion protein composed of a fragment of CD4 joined to an immunoglobulin light or heavy chain. The CD4 fragment replaces the variable region of the immunoglobulin chain and binds to the envelope protein gp120 of HIV. A nucleic acid encoding the fusion protein, host cells transformed with the nucleic acid and methods for treatment using the fusion protein can also be alleged to be disclosed.

Gascoigne et al. can be alleged to disclose a chimeric immunoglobulin protein composed of a T-cell receptor variable domain joined to the constant region of an immunoglobulin.

Traunecker et al. can be alleged to disclose a chimeric immunoglobulin protein composed

ZG 000756

of the extracellular domains of CD4 joined to the constant region of an immunoglobulin light chain.

Ellis et al. can be alleged to disclose a hybrid receptor protein composed of the extracellular domain of the human insulin receptor joined to the transmembrane and cytoplasmic domains of the bacterial aspartate chemoreceptor.

Riedel et al. can be alleged to disclose a chimeric receptor composed of the extracellular and transmembrane domains of human epidermal growth factor (EGF) receptor joined to the cytoplasmic domain of avian *erbB* oncogene product.

B.    MANNER OF APPLYING THE U.S. PATENTS AND ARTICLES TO THE '026 PATENT CLAIMS

Each of the '603 Capon, '335 Capon and '705 Seed U.S. patents and the Traunecker and Gascoigne articles allegedly disclose fusion proteins composed of a ligand binding domain of a receptor joined to heterologous protein domains such as a constant region of an immunoglobulin. These patents and articles allegedly disclose the corresponding recombinant methods for producing these fusion proteins as well. Ellis allegedly discloses a method for producing a fusion protein composed of an insulin-binding domain of an insulin receptor joined to an intracellular domain of another receptor. Riedel allegedly discloses a method for producing a chimeric receptor of an EGF binding domain of an EGF receptor joined to an intracellular domain of another protein.

A reasonable Examiner allegedly would find that these U.S. patents and articles disclose features of the claimed polypeptide fusions of the '026 patent. These U.S. patents and articles may be seen to show fusion protein chains allegedly similar to those of the '026 patent, namely those composed of ligand binding domains of receptors joined to heterologous protein domains such as the constant regions of immunoglobulins or intracellular domains other than immunoglobulin domains in the case of Ellis and Riedel.

ZG 000757

REQUEST FOR REEXAMINATION UNDER 35 U.S.C. §302 AND 37 C.F.R. §1.510    Page 5
U.S. Patent No. 6,018,026
Title: BIOLOGICALLY ACTIVE DIMERIZED AND MULTIMERIZED POLYPEPTIDE FUSIONS

In particular, the '335 and '603 Capon patents allegedly provide examples of fusion proteins having adheson or ligand binding domains joined to immunoglobulin fusion partners. The ligand binding domains include those of CD1, CD2, CD4, CD8 and CD28 as well as the ligand binding domains of such receptors as the IgE receptor, the PDGF receptor, the CSF-1 receptor and the like. Their immunoglobulin fusion partners allegedly include the light and heavy chain constant regions or combined variable-constant regions of such immunoglobulins as IgG, IgA, IgE, IgD and IgM.

In particular, the '781 Seed patent allegedly discloses a similar fusion protein and a recombinant method to make it. The Seed fusion protein allegedly is an immunoglobulin of the IgM or IgG class having its variable region replaced by the ligand binding domain of CD4, the immune cell surface protein that binds to the envelope protein gp120 of the HIV virus.

Ellis and Riedel allegedly disclose fusion proteins having intracellular domains other than immunoglobulin domains.

When the particulars of these disclosures are compared with the fusion proteins recited by each of the 29 claims of the '026 patent, significant similarities are allegedly apparent. Each of the '026 patent claims recites, with either generic or specific language, a fusion protein having a non-immunoglobulin polypeptide (such as a ligand binding domain) and a polypeptide domain heterologous to the non-immunoglobulin polypeptide (such as a constant region domain of an immunoglobulin). This kind of fusion protein allegedly echoes the fusion proteins disclosed by Capon, Seed, Traunecker, Gascoigne, Ellis and Riedel. For example, the '026 patent exemplifies a PDGF receptor domain (SEQ ID No's 1 and 2) joined to the constant region of an immunoglobulin. Similarly, the '335 and '603 Capon patents allegedly name this same receptor as an example of an adheson joined to an immunoglobulin light or heavy chain constant region.

ZG 000758

Consequently, the disclosures of these U.S. patents and articles raise a substantial question of patentability for each claim of the '026 patent. There is a substantial likelihood that a reasonable Examiner would consider these U.S. patents and articles important in deciding whether or not these claims are patentable. A reasonable Examiner would consider this question of patentability and appropriately apply the patent statutes 35 U.S.C. §§102(b), 102(e), 102(g) and/or 103(a) based upon the relevant filing and publication dates of these U.S. patents and articles under consideration. A reasonable Examiner would also investigate the entitlement of such U.S. patents to the filing dates pursuant to the statements of pendency given in the Cross-References to Related U.S. Application Data provided in the U.S. patents, and would investigate the mailing dates of the articles under consideration.

## IV. CONCLUSION

In view of the above information, ZymoGenetics respectfully requests issuance of an order for the reexamination of the claims of the '026 patent under 35 U.S.C. §304 and 37 CFR §1.525. Notwithstanding the question of patentability that has been raised, ZymoGenetics believes that upon re-examination of the '026 patent, a certificate of patentability will be issued.

Respectfully submitted,

Andrzej Z. Sledziewski et al.
By their Representatives,

SCHWEGMAN, LUNDBERG, WOESSNER & KLUTH, P.A.
P.O. Box 2938
Minneapolis, MN 55402
(612) 373-6939

Date: March 16, 2004    By _____
A. James Nelson
Reg. No. 28,650

"Express Mail" mailing label number: EV 299 686 675 US
Date of Deposit: March 16, 2004
This paper or fee is being deposited on the date indicated above with the United States Postal Service pursuant to 37 CFR 1.10, and is addressed to the Commissioner for Patents, Mail Stop Patent Application, P.O. Box 1450, Alexandria, VA 22313-1450.

ZG 000759

# EXHIBIT 10

SHEET 1                                                                    1

1                    IN THE UNITED STATES DISTRICT COURT

2                    IN AND FOR THE DISTRICT OF DELAWARE

3                              - - -

4    ZYMOGENETICS, INC., a
     Washington corporation,        :      CIVIL ACTION
                                     :
5              Plaintiff,            :
                                     :
6         v                          :
                                     :
7    BRISTOL-MYERS SQUIBB CO., a     :
     Delaware corporation, and       :
8    DOES 1 THROUGH 100,             :
                                     :
9              Defendants.           :      NO. 06-500 (***)

10                             - - -

11                        Wilmington, Delaware
                   Thursday, November 8, 2007 at 4:00 p.m.
12                        TELEPHONE CONFERENCE

13                             - - -

14   BEFORE:    HONORABLE MARY PAT THYNGE, U.S. MAGISTRATE JUDGE

15                             - - -

     APPEARANCES:
16

17              POTTER ANDERSON & CORROON, LLP
                BY:  PHILIP A. ROVNER, ESQ.
18
                     and
19
                PERKINS COIE, LLP
20              BY:  PAUL J. ANDRE, ESQ.
                     (Menlo Park, California)
21
                     Counsel for Plaintiff
22

23

24                              Brian P. Gaffigan
                                Registered Merit Reporter
25

Thursday, November 8, 2007

SHEET 2

**2**

1  APPEARANCES: (Continued)

2        RICHARDS, LAYTON & FINGER, P.A.
3        BY: KELLY E. FARNAN, ESQ.

4        and

5        FITZPATRICK CELLA HARPER & SCINTO
         BY: CHRISTOPHER P. BORELLO, ESQ., and
6        COLLEEN TRACY, ESQ.
         (New York, New York)
7
         Counsel for Defendants
8

9

10

11

12              - oOo -

13        P R O C E E D I N G S

14        (REPORTER'S NOTE: The following telephone

15  conference was held in chambers, beginning at 4:00 p.m.)

16        THE COURT: Good afternoon, this is Judge

17  Thynge.

18        MS. FARNAN: Good afternoon, Your Honor.

19        MR. ROVNER: Good afternoon, Your Honor.

20        THE COURT: Who do I have on the line for

21  ZymoGenetics, please?

22        MR. ROVNER: Your Honor, for the plaintiff

23  ZymoGenetics, it's Phil Rovner; and Paul Andre is with me.

24        THE COURT: All right. And who is on the line

25  on behalf of Bristol-Myers?

**3**

1        MS. FARNAN: Your Honor, for Bristol-Myers, it's

2  Kelly Farnan. I also have on the line Colleen Tracy and

3  Chris Borello, my co-counsel.

4        THE COURT: I'm writing the names down. That's

5  why it's taking a little while.

6        Counsel, the reason I have you on the line is

7  to talk about the matter that you teed up to me concerning

8  bifurcation of the issue of willfulness and any potential

9  enhanced damage stemming from that, including the discovery

10  relating to that. And I'm assuming you are also asking for

11  bifurcation of damages basically, too. Is that correct?

12        MS. FARNAN: Your Honor, this is Kelly Farnan on

13  behalf of Bristol-Myers. In our application. I did not did

14  not ask for the bifurcation of damages.

15        THE COURT: It's just a bifurcation of

16  willfulness.

17        MS. FARNAN: Yes.

18        THE COURT: All right. Why don't you give me

19  your very brief thoughts on this. I realize that you had

20  the chance to sort of mini-brief it to me but give me the

21  best highlights of your discussion.

22        MS. FARNAN: Sure. Your Honor, on behalf of

23  Bristol-Myers, it's Kelly Farnan. And I think the best

24  highlights of our discussion are, of course, Seagate set

25  forth a new standard for willfulness and I think it's a

**4**

1  standard that lends itself to bifurcation. Not only did

2  the Federal Circuit set forth a new two-part test but in

3  that change, it changed the burden of proof to clear and

4  convincing.

5        Now, as a practical matter, willfulness may

6  never be an issue in this case, but if it does become an

7  issue, the Federal Circuit recognized that an alleged

8  infringer shouldn't be forced to make the decision of

9  whether to waive the attorney-client privilege unless

10  necessary and that bifurcation was an appropriate method

11  to deal with the timing of the disclosure of the

12  attorney-client privilege  In this case, if infringement

13  validity and willfulness all go to trial before the same

14  jury, you are having the jury consider certain issues on a

15  preponderance of the evidence standard and other issues

16  under clear and convincing. The courts have previously

17  bifurcated issues under the risk of jury confusion. I

18  think the risk is even greater added two separate burdens

19  of proof. So in light of this heightened standard,

20  Bristol-Myers does not believe all the issues should go to

21  trial all at once and that in conjunction with that, that

22  infringement and validity should go to trial first and that

23  Bristol should be entitled to wait to decide to waive the

24  attorney-client privilege until after infringement and

25  validity have been decided.

**5**

1        Now, ZymoGenetics has argued it would be a waste

2  of resources to conduct two trials but if infringement and

3  validity are decided, I think the parties can work out an

4  efficient way to, first of all, complete their discovery on

5  willfulness and then to present willfulness in a streamlined

6  way. The prejudice to Bristol-Myers of waiving the

7  attorney-client privilege, if unnecessary, I think would

8  outweigh any inconvenience.

9        I think those are the highlights of our argument

10  but if Your Honor has any questions, I'm certainly willing

11  to answer them.

12        THE COURT: All right. Thank you.

13        MR. ANDRE: Your Honor, this is Paul Andre

14  for ZymoGenetics. In a nutshell, our argument is based

15  on Bristol's logic, every single patent case would be

16  bifurcating willfulness, and that means you would have to

17  have two jury trials for every single case. Because the

18  Seagate case, it doesn't support the fact that you should

19  bifurcate. In fact, it is quite the opposite. It actually

20  states that the issue of willfulness will be determined by

21  the record developed in the infringement case so under

22  this idea of bifurcating, having two different jury trials,

23  two different juries, you just go back in and reprove

24  infringement once again to show the willfulness issue.

25  Seagate just doesn't propose bifurcating cases.

Thursday, November 8, 2007

SHEET 4

10

1  or so obvious it should have been known to the accused
2  infringer.
3              What do you do with that language?
4              MR. ANDRE: Well, I think that language is,
5  obviously, one that is putting forth the evidentiary issues
6  that the patentee has to prove. I don't think that language
7  is saying that is going to preclude the normal course
8  of discovery into this issue of willfulness. I don't think
9  there is anything in Seagate that talks about how the trial
10 should be conducted or how evidence is brought in.
11             I mean I agree that what the Federal Circuit
12 here is saying is we have the burden of proof first showing
13 there is this objective standard that is reached, and then
14 it's up to, if we think we've accomplished that, then the
15 standard, the subjective standard can come into play. There
16 is a threshold objective standard that we have to reach. I
17 agree with that. But I don't think there is anything in
18 Seagate that would cause one to say that this mandates
19 bifurcation. I think this can be done simultaneous.
20             Now, there is the issue, of course, that no
21 one likes waiving privilege even with the limited scope,
22 and that the waiver of privilege is something that should
23 be taken very seriously, and I don't think anyone would
24 disagree with that, but it is a decision that alleged
25 infringers can make and they know that they can make it

11

1  going into any type of a case, and now it's made earlier by
2  Seagate and by Knorr Bremse. So I don't think there is
3  anything in this case, and particularly the passages cited
4  here, that is necessarily saying that you need to bifurcate.
5  This is just the burdens of proof at trial.
6              THE COURT: Okay. Kelly, do you wish to
7  respond? And, first of all, how about responding to that
8  last point that Paul made that Seagate really doesn't
9  address how the trial necessarily proceeds or how discovery
10 proceeds and that maybe a threshold objective standard
11 has to be met at trial initially and maybe that is where
12 the court steps in and says I don't think the objective
13 threshold standard was met, this issue of willfulness will
14 not go to the jury, and the more subjective or not knowing
15 evidence may not be presented or breaking it out that way,
16 breaking it out at the trial at that proceeding rather than
17 breaking it out in discovery.
18             MS. FARNAN: Your Honor, I think everyone
19 recognizes that waiving the attorney-client privilege is a
20 serious thing, and if you recognize that there is a
21 threshold standard and there has to at some point be a
22 determination as to whether or not that threshold isn't
23 met before evidence of Bristol's reliance on opinion of
24 counsel gets to the jury, I think it makes sense to do
25 that through bifurcation because otherwise Bristol is

12

1  prejudiced by having to waive the attorney-client privilege
2  if it may not be necessary. I think that is sort of the
3  most important here is that you do have a threshold inquiry.
4              THE COURT: Well, then aren't you also saying
5  what Paul said, and that is every patent case is going to
6  result in bifurcation of willfulness and you you are going to
7  end up potentially with two trials in every case?
8              MS. FARNAN: I think that is a risk, but I think
9  the reality is willfulness doesn't become an issue in every
10 case. Sometimes, it's not asserted. Other times --
11             THE COURT: Let me put it this way, Kelly. In
12 this jurisdiction, it's a rarity where it isn't asserted.
13 But go ahead.
14             MS. FARNAN: Well, I understand that, but
15 that doesn't necessarily means there will be two trials in
16 every case. And as we mention in our letter, we're not
17 sure that this case will ever get to willfulness or that
18 willfulness is appropriate in light of the reexaminations
19 that were submitted. So I think the reality is, sure, we're
20 advocating a position that bifurcation is appropriate to
21 avoid an early disclosure of the attorney-client privilege,
22 but I don't think that means that there is going to, in
23 reality, be two trials in every patent case. And I think
24 the second trial can be done in such a way to be efficient
25 that that eliminates the prejudice to Bristol-Myers of

13

1  having had to waive the attorney-client privilege.
2              THE COURT: If you are going to try willfulness
3  in the second part of the case -- let's assume infringement
4  is found, let's assume validity is upheld by the jury or
5  continued by the jury and we now get to the second trial and
6  this is only on willfulness -- isn't there going to be some
7  repeat related to issues of infringement?
8              MS. FARNAN: I think to the extent there is
9  any repeat, it would probably be minimal and can be dealt
10 with by stipulation to the parties and instruction to the
11 jury. I think there are plenty of times when issues not of
12 infringement or validity are sent to the jury and are done
13 so through some kind of stipulation or instruction to the
14 jury. So while there may be some minor overlap, I think
15 that there are ways to deal with that and there are ways
16 that people have dealt with that and that sort of any minor
17 overlap that there might be is outweighed, like I said,
18 by the prejudice of having to waive the attorney-client
19 privilege before some threshold standard has been met.
20             THE COURT: Well, don't you see that even in
21 bifurcation that you may end up doing is not only potential-
22 ly having two trials in almost every patent case but also
23 two sets of summary judgment motions in almost every patent
24 case because I can foresee; and you tell me if I'm out of my
25 mind, but I don't think I am; that the judges on this bench,

United States District Court - Honorable Mary Pat Thynge

SHEET 5

**14**

1  except for maybe Chief Judge Sleet, there is a time, though,
2  for filing motions for summary judgment. That is consistent
3  among all the judges. That timing of those motions for
4  summary judgment are dependent upon and varies from judge to
5  judge.
6      But in the second, if everything is bifurcated,
7  the discovery on it and the trial, then you follow-up
8  with your infringement and validity trial with discovery
9  going on, whether there is willfulness, and then potentially
10  a round of briefing on whether plaintiff has met the
11  objectively reckless standard. And then maybe you get to
12  trial on the issue of willfulness. So explain to me if you
13  think that I'm completely wrong, that that type of process
14  may end up.
15      MS. FARNAN: So you are suggesting briefing on
16  the threshold and not necessarily a summary judgment of
17  willful infringement?
18      THE COURT: Well, I'm saying I can see more, I
19  can see summary judgment on a willful infringement, and I
20  have seen it enough times. I have seen the issue. But what
21  you are suggesting is there is going to be, it's going to be
22  in the second part. So we have done one round of summary
23  judgment motions, we've gone through a trial on these
24  points. We wait around, take some more discovery afterwards
25  and we end up with another round of summary judgment, and I

**15**

1  can see it potentially breaking down that the summary
2  judgments motions can be on willfulness totally or they
3  can be on willfulness, on whether or not the plaintiffs met
4  the objective standard.
5      MS. FARNAN: I think on whether or not
6  plaintiffs met the objective standard, I mean, I think
7  Mr. Andre's suggestion is that that should be dealt with in
8  the middle of trial so I think that is actually going to be
9  more onerous. This may make more sense to deal with that in
10  an orderly fashion because at some point that standard has
11  to be met and making that determination in the middle of
12  trial and determining whether or not to send evidence of
13  advice of trial in front of a jury, I think it's probably
14  more appropriate to do it more orderly. So I think while
15  that does slightly increase the court's workload, I think it
16  is maybe a more orderly way to proceed.
17      And with respect to summary judgment on
18  willfulness, you don't often see, or maybe you have seen a
19  lot, I haven't often seen summary judgments on willful
20  infringement but I guess that is sort of a problem with a
21  two-part test is to the extent that happens and I guess that
22  is something that the parties will have to be reasonable and
23  try not to bring too many issues before the court.
24      THE COURT: Paul, what type of discovery do you
25  see occurring in this case on willfulness?

**16**

1      MR. ANDRE: Well, Your Honor, I'm not sure.
2      THE COURT: Let's make an assumption there is an
3  opinion of counsel out there.
4      MR. ANDRE: Okay. You decide whether there is
5  opinion of counsel or not.
6      THE COURT: Let's assume there is opinion of
7  counsel. It's not only there is opinion of counsel, you
8  have to make the other assumption they will produce it.
9      MR. ANDRE: Okay.
10      THE COURT: They will waive attorney-client
11  privilege in that regard.
12      MR. ANDRE: Sure. I imagine what we would want
13  to know is what -- because as Knorr Bremse said, the opinion
14  of counsel is just one of many factors you look into to
15  determine the reasonableness of the company. And what we
16  would probably want to find out is what are they relying
17  upon, how they were going to use it, the opinion of counsel,
18  and any other affirmative defenses to that claim. We don't
19  know what those affirmative defenses are at that point on
20  discovery into it. If it was opinion of counsel, we
21  obviously would want to take discovery into the reliance
22  upon opinion of counsel, whether opinion of counsel was
23  competent or not. We'd have to look into it. If it was
24  competent, maybe we wouldn't need to take the deposition of
25  the attorney who prepared those opinions. We don't know.

**17**

1  If it is a competent opinion and we don't want to take that
2  discovery, we certainly would not do so. But you just don't
3  know. At this point, we're trying to read the tea leaves.
4      THE COURT: Well, I understand. Typically,
5  there is a game plan to some extent I would think with most
6  counsel when they are defending or prosecuting a case and
7  there is some idea, because you have got to have some game
8  plan on both sides because you are saying to the court we
9  think we can get the discovery done in X amount of time and
10  that is done.
11      MR. ANDRE: Yes.
12      THE COURT: So there has to be some thought
13  process in that regard, but you see potentially taking --
14  well, if they didn't have an opinion of counsel or more
15  importantly they don't waive it, what type of discovery
16  then do you see for willfulness?
17      MR. ANDRE: Well, I think what we want to see
18  is what measures the company took, whether they considered
19  the patents in trying to come up with a design-around. The
20  other factors, the Reed factors that the court can look at
21  that shows how a company is reasonable, and take discovery
22  into those issues. It probably would be very limited
23  discovery to be quite frank with you. We know that they had
24  knowledge of these patents prior to the litigation and we
25  have been in contact with them so we get that on record,

Thursday, November 8, 2007

SHEET 7

**22**

1  being presented to the jury in the go-around on liability.
2  Depending upon what the jury decided on the liability phase
3  would determine whether or not we would have any evidence
4  presented on willfulness and any evidence presented on
5  damages. So there has been a variety of approaches in this
6  court in an attempt to address the concerns expressed by
7  counsel.
8      What it sounds like to me, and you correct me
9  if I'm wrong, Paul, about this, the only thing that is left
10  on willfulness from your viewpoint I guess is the opinion
11  of counsel aspect and whether or not you get it now and/or
12  have you been prevented to take discovery on the other
13  willfulness aspects? You know, other evidence of
14  willfulness.
15      MR. ANDRE: At this point, Your Honor, they
16  have not provided us. We have had issues of willfulness and
17  written discovery and there have been objections to that.
18  But mostly it has focused on the opinion of counsel.
19      THE COURT: Yes, but I mean I'm trying to find
20  out what are their objections to the other discovery, the
21  other discovery outside of opinion of counsel.
22      MR. ANDRE: Sitting here off the top of my head,
23  I don't know that there has been additional objections on
24  that discovery. We have been able to discover certain
25  issues that would factor into the showing of objective

**23**

1  recklessness. I think probably most of the discovery has
2  been denied on the idea of the opinion of counsel.
3      THE COURT: Okay.
4      MS. FARNAN: Your Honor, that is my
5  understanding as well. That it's only the waiver that is
6  left.
7      THE COURT: Yes, so that is really
8  Bristol-Myers' issue. Do we waive opinion of counsel now,
9  and the argument that you are making about willfulness being
10  bifurcated is really just focused on the opinion of counsel.
11      This is what my thought was. To the extent that
12  discovery was not allowed or prevented or reduced on the
13  initial objective argument that has to be obviously reached,
14  and that is the objective recklessness, I really do think
15  discovery should be allowed to go forward.
16      I am not inclined at this stage, and where this
17  case presently is, to necessarily bifurcate willfulness
18  because I'm not going to be the judge trying this case.
19  That's in part a concern that I have and any decision that
20  I make now may very well bind one of the District Court
21  judges on this bench or a new one that starts on this bench.
22      My thought was also that we hold off on
23  willfulness, hold off on opinion of counsel for now, but
24  I would allow it to be revisited, to allow additional
25  discovery to be taken. And I think on that point that my

**24**

1  decision on not bifurcating willfulness does not necessarily
2  bind next judge, that my decision on keeping the opinion of
3  counsel protected for now does not bind the next judge, and
4  both parties understanding and recognizing that they have
5  that. That ZymoGenetics would have the right to request to
6  get opinion of counsel and to be able to take some discovery
7  on it. As you have indicated, Paul, you think max probably
8  four depositions and some written discovery, not much, and
9  you revisit the issue of bifurcation because what has been
10  said to me is there has been some discovery taken on
11  willfulness at this point on the objective standard. I'm
12  saying that that discovery should be allowed to go forward
13  and get completed.
14      On the more subjective standard on opinion of
15  counsel, quite frankly, I'm punting it a bit because, like I
16  said, I'm not 100 percent certain what's Seagate's approach
17  and what solution is going to work with the Seagate opinion,
18  whether we stop it at the discovery level completely and
19  then face the prospect of bifurcating every case, which I
20  don't think is going to happen, whether we allow discovery
21  to go forward and do whatever we need to do at trial. But
22  to the extent that it is really left at the trial level,
23  that is going to affect some other judge's approach to this
24  trial and potentially limit that judge.
25      So those are my thoughts on this, so I make both

**25**

1  sides miserable.
2      MR. ANDRE: Your Honor, speaking for
3  ZymoGenetics, I think that is a reasonable approach.
4      THE COURT: Well, you are happy because you
5  don't have to give up your opinion of counsel right now.
6      MR. ANDRE: That is a reasonable approach, I
7  think. We can wait for the discovery until we determine
8  what judge is going to hear this case and get that judge's
9  preference on it who is administering the trial.
10      THE COURT: Yes. From your standpoint, I would
11  think, and then Bristol-Myers should be happy because they
12  don't have to give their opinion of counsel. They're not
13  happy I didn't bifurcate it but they didn't have to give up
14  opinion of counsel.
15      MS. FARNAN: Your Honor, of course we're happy
16  we don't have to give it up now. I just want to be clear,
17  it's that we're going to hold off until there is another
18  judge so discovery on that portion is stayed.
19      THE COURT: That is basically what it is, but I
20  don't want one side or the other to argue, well, gee,
21  discovery has now passed. I am carving this out because any
22  judge who is going to get this is going to potentially pick
23  a trial date. That date is going to be picked some time in
24  the future. There is usually enough time to get this type
25  of discovery, and I don't believe there is that much, on the

United States District Court - Honorable Mary Pat Thynge

SHEET 8                                                    26

1  more subjective part of the analysis done in fairly short
2  order, in fairly easy order.
3           MS. FARNAN:  Your Honor, this is Kelly Farnan.
4  Just to be clear, our position would be on the objective
5  portion, that that has been completed and what would be left
6  to be decided later would be our waiver and the discovery on
7  that.
8           THE COURT:  I'm not certain about that because,
9  like I said, I haven't seen the discovery, Kelly, but to the
10 extent it hasn't been responded or hasn't been finished up,
11 I want that to be completed because I think when your motion
12 was filed, or when it first was discussed -- the motion was
13 filed on October 15th.  I can't remember when we had our
14 first discussion.  October 4th.  Was discovery closed at
15 that time?
16          MS. FARNAN:  Discovery closed October 12th.
17          THE COURT:  Okay.  So between the time the issue
18 was raised and the time it's been addressed, discovery is
19 closed.
20          MS. FARNAN:  That's correct.
21          THE COURT:  So there could be some.  I don't
22 know if there are any other points but that is, to me,
23 extremely limited in any event.
24          MS. FARNAN:  Understood.
25          THE COURT:  Okay.  So I'm not going to decide it

                                                           27

1  should be bifurcated.  I really do have a concern that
2  Seagate or its progeny, if there are going to be any progeny
3  from it -- because I know we're not going to get any more
4  direction from the Fed Circuit on how to try to manage our
5  trials or our pretrial matters, because I don't think they
6  really know how to give us any advice on that for the most
7  part -- I just don't want to see every case now subject to
8  bifurcation because of Seagate.  I clearly don't believe
9  that was Seagate's intent but I do think that bifurcation is
10 appropriate and I still think it's a discretionary matter
11 for the court, particularly the trial judge.
12          Okay.  Thank you.
13          MR. ANDRE:  Thank you, Your Honor.
14          THE COURT:  Thank you very much.
15          MS. FARNAN:  Thank you, Your Honor.
16          THE COURT:  Take care now.  Good-bye.  Have a
17 great weekend, all.
18          (Telephone conference ends at 4:37 p.m.)
19
20
21
22
23
24
25

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Philip A. Rovner, hereby certify that on May 23, 2008, the within document

was filed with the Clerk of the Court using CM/ECF which will send notification of such

filing(s) to the following; that the document was served on the following counsel as indicated;

and that the document is available for viewing and downloading from CM/ECF.

### BY HAND DELIVERY AND E-MAIL

Frederick L. Cottrell, III, Esq.
Kelly E. Farnan, Esq.
Richard Layton & Finger, P.A.
One Rodney Square
P. O. Box 551
Wilmington, DE  19899
cottrell@rlf.com
farnan@rlf.com

I hereby certify that on May 23, 2008 I have sent by E-mail the foregoing

document to the following non-registered participant:

Christopher P. Borello, Esq.
Colleen Tracy, Esq.
Fitzpatrick Cella Harper & Scinto
30 Rockefeller Plaza
New York, NY  10112
cborello@fchs.com
ctracy@fchs.com

/s/ Philip A. Rovner
Philip A. Rovner  (#3215)
Potter Anderson & Corroon LLP
Hercules Plaza
P. O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com

748348