# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

ZYMOGENETICS, INC., a Washington
Corporation,

     Plaintiff,

   v.

BRISTOL-MYERS SQUIBB CO.,
a Delaware Corporation, and DOES 1
through 100,

     Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)

C.A. No. 06-500-SLR-MPT

**PUBLIC VERSION**

## PLAINTIFF ZYMOGENETICS, INC.'S REBUTTAL CLAIM CONSTRUCTION BRIEF

OF COUNSEL:

Paul J. Andre
Lisa Kobialka
KING & SPALDING LLP
1000 Bridge Parkway
Suite 100
Redwood Shores, CA 94065
(650) 590-0700

Dated:  June 23, 2008
Public Version:  June 30, 2008

Philip A. Rovner (#3215)
POTTER ANDERSON & CORROON LLP
Hercules Plaza
P. O. Box 951
Wilmington, DE  19899
(302) 984-6000
provner@potteranderson.com

*Attorneys for Plaintiff*
*ZymoGenetics, Inc.*

# TABLE OF CONTENTS

**Page**

NATURE AND STAGE OF THE PROCEEDINGS ...................................................................1

SUMMARY OF THE ARGUMENT ....................................................................................1

ARGUMENT ..................................................................................................................2

    A.   Biological Activity..............................................................................................3

    B.   Dimerizing Protein.............................................................................................5

          i.   Bristol's Additional Limitation Requiring ▓▓▓▓ is an Improper Attempt to Read in a Limitation to the "Dimerizing Protein" Claim Element from a Preferred Embodiment................................................................................................6

         ii.   Bristol's Additional Limitation to the Term "Dimerizing Protein" ▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓ is Another Improper Results-Driven Limitation..............8

       iii.  Bristol Relies on Extrinsic Evidence to Support Its Importation of Two Additional Improper Limitations to the "Dimerizing Protein" Term ...............................9

       iv.  Bristol Inappropriately Relies on the Prosecution History of a Distantly Related Patent Which Contains Different Claim Limitations....................................10

    C.   "Ligand-Binding Domain Of A Receptor" and "ligand"....................................10

       1.  "Ligand-Binding Domain"..........................................................................10

       2.  "ligand" ...................................................................................................12

    D.   Receptor Analog ...............................................................................................12

    E.   Non-Immunoglobulin Polypeptide ....................................................................13

       1.  The Term Immunoglobulin Has A Commonly Understood Scientific Meaning, Which Is Consistent With Its Use In The ZymoGenetics Patents .......................15

       2.  Bristol's Reliance On Extrinsic Evidence To Change The Plain And Ordinary Meaning Of "Non-immunoglobulin Polypeptide" Is Improper.......................16

          a.   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓......................................................17

             i.   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓......................................................17

             ii.   ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓....................................18

iii. ███████████████████████████████ ..............19

iv. The Preferred Disclosed Embodiment, PDGFR-Ig, is Read Out of the Claims Based on Bristol's Interpretation of Non- Immunoglobulin ..............20

b. Reliance on Inventor Testimony Is Improper .........................................................21

F. Requiring Dimerization For Biological Activity ...............................................................22

1. Bristol's Proposed Construction Is Inconsistent With The Intrinsic Evidence...............23

2. Bristol's Prosecution Disclaimer Argument is Inapposite............................................24

3. The Inventor and Expert Testimony Cited by Bristol Constitutes Unreliable Extrinsic Evidence ......................................................................................................26

G. "Biologically Active"/ "Active" .......................................................................................27

CONCLUSION...............................................................................................................28

# TABLE OF AUTHORITIES

CASES

*Allen Eng'g Corp. v. Bartell Indus., Inc.,*
   299 F.3d 1336 (Fed. Cir. 2002)..............................................................................27

*Bard, Inc. v. M3 Sys., Inc.,*
   157 F.3d 1340 (Fed. Cir. 1998)..............................................................................27

*Bicon, Inc. v. Straumann Co.,*
   441 F.3d 945 (Fed. Cir. 2006)................................................................................27

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.,*
   289 F.3d 801 (Fed. Cir. 2002)................................................................................27

*CCS Fitness, Inc. v. Brunswick Corp.,*
   288 F.3d 1359 (Fed. Cir. 2002).......................................................................4, 11-12

*Computer Docking Station Corp. v. Dell, Inc.,*
   519 F.3d 1366 (Fed. Cir. 2008)..............................................................................27

*Gemstar-TV Guide Intl., Inc. v. Intl. Trade Commission,*
   383 F.3d 1352 (Fed. Cir. 2004)................................................................................8

*Gentry Gallery, Inc. v. Berkline Corp.,*
   134 F.3d 1473 (Fed. Cir. 1998)..............................................................................21

*Goodyear Dental Vulcanite Co. v. Davis,*
   102 U.S. 222 (1880)..............................................................................................19

*Hoganas AB v. Dresser Indus., Inc.,*
   9 F.3d 948 (Fed. Cir. 1993)..................................................................................6-7

*Honeywell Int'l, Inc. v. Univ. Avionics Sys. Corp.,*
   493 F.3d 1358 (Fed. Cir. 2007)........................................................................*Passim*

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,*
   381 F.3d 1111 (Fed. Cir. 2004)................................................................................2

*Intervet Am., Inc. v. Kee-Vet Labs., Inc.,*
   887 F.2d 1050 (Fed. Cir. 1989).........................................................................7, 19

*Johnson Worldwide Assocs., Inc. v. Zebco Corp.,*
   175 F.3d 985 (Fed. Cir. 1999)................................................................................23

*Jonsson v. Stanley Works,*
   903 F.2d 812 (Fed. Cir. 1990)................................................................................10

*Key Pharms. v. Hercon Labs. Corp.,*
    161 F.3d 709 (Fed. Cir. 1998)................................................................................9

*Markman v. Westview Instruments, Inc.,*
    52 F.3d 967 (Fed. Cir. 1995) (en banc), *aff'd,* 517 U.S. 370 (1996) .................................22, 26

*McCarty v. Leigh Valley R.R. Co.,*
    160 U.S. 110 (1895)................................................................................6-7, 10, 23

*Merck & Co. v. Teva Pharms. USA, Inc.,*
    347 F.3d 1367 (Fed. Cir. 2003)................................................................................23

*NeoMagic Corp. v. Trident Microsystems, Inc.,*
    287 F.3d 1062 (Fed. Cir. 2002)................................................................................4, 7-8, 21

*Omega Eng'g, Inc. v. Raytek Corp.,*
    334 F.3d 1314 (Fed. Cir. 2003)................................................................................25

*On-Line Tech. v. Bodenseewerk Perkin-Elmer GmbH,*
    386 F.3d 1133 (Fed. Cir. 2004)................................................................................21

*Pfizer, Inc. v. Ranbaxy Labs., Ltd.,*
    457 F.3d 1284 (Fed. Cir. 2006)................................................................................17

*Phillips v. AWH Corp.,*
    415 F.3d 1303 (Fed. Cir. 2005)................................................................................*Passim*

*Purdue Pharma L.P. v. Endo Pharms., Inc.,*
    438 F.3d 1123 (Fed. Cir. 2006)................................................................................18, 20

*Shum v. Intel Corp.,*
    499 F.3d 1272 (Fed. Cir. 2007)................................................................................9, 11, 22

*Sofamore Danek Group, Inc. v. DePuy-Motch, Inc.,*
    74 F.3d 1216 (Fed. Cir. 1996)................................................................................20

*Solomon v. Kimberly-Clark Corp.,*
    216 F.3d 1372 (Fed. Cir. 2000)................................................................................22, 26

*TAP Pharm. Prods., Inc. v. Owl Pharms., LLC,*
    419 F.3d 1346 (Fed. Cir. 2005)................................................................................18-19

*Vitronics Corp. v. Conceptronic, Inc.,*
    90 F.3d 1576 (Fed. Cir. 1996)................................................................................*Passim*

## NATURE AND STAGE OF THE PROCEEDINGS

On August 14, 2006, ZymoGenetics, Inc. ("ZymoGenetics") filed suit against Bristol-Myers Squibb Co. ("Bristol") asserting infringement of U.S. Patent No. 5,843,725 ("the '725 patent") and U.S. Patent No. 6,018,026 ("the '026 patent") (collectively, the "ZymoGenetics Patents"). *See* Declaration of Amy Sun in Support of ZymoGenetics, Inc.'s Rebuttal Claim Construction Brief ("Sun Decl."), Ex. 1 ('725 Patent); Ex. 2 ('026 Patent). The parties have completed fact discovery and expert discovery.

Pursuant to the December 13, 2007 Scheduling Order of the Court (D.I. 138), on May 16, 2008, the parties filed their opening claim construction briefs. The hearing on the parties' summary judgment motions and claim construction briefs is currently scheduled for June 27, 2008.

## SUMMARY OF THE ARGUMENT

Bristol's Opening Claim Construction Brief, like its proposed claim constructions themselves, needlessly complicates the straightforward task before the Court. Here the Court need look no further than the language of each patent itself -- including the explicit definitions provided in the specifications -- to construe the claims. This is exactly what is supposed to happen: an inventor makes a clear and defined disclosure in the patent itself, and that plain disclosure determines the scope of protection.

In short, the parties' claim construction briefing centers on the following terms in the ZymoGenetics Patents:

- "biological activity"
- "dimerizing protein"
- "receptor analog"
- "ligand-binding domain of a receptor"
- "ligand"
- "non-immunoglobulin polypeptide"
- "requiring dimerization for biological activity"
- "active"
- "biologically active"

The terms "biological activity," "dimerizing protein," "receptor analog," "ligand-binding domain of a receptor," and "ligand" are explicitly defined in the ZymoGenetics Patents. *See* Sun Decl., Ex. 1, col. 9, ll. 18-54; *see also id.*, Ex. 2, col. 9, l. 30 to col. 10, l. 6. Nonetheless, Bristol contends, without support, that the Court should adopt constructions different than the definitions explicitly provided by the inventors. The terms "active" and "biologically active" do not require construction at all because they are non-limiting terms found only in the preambles. Thus, only the terms "non-immunoglobulin polypeptide" and "requiring dimerization for biological activity" are truly at issue. And, these terms should be afforded their ordinary meaning to one of skill in the art in the context of the patents, including the definitions provided in the specifications.

Bristol, however, ignores the actual patents and, instead, hides behind red herrings and straw men. When read in connection with its non-infringement brief, Bristol's claim construction strategy becomes clear. If the plain and ordinary meanings of the disputed claim terms are applied, Bristol cannot avoid a finding of infringement. Because Bristol's proposed claim constructions are not supported by intrinsic evidence, namely the ZymoGenetics Patents' claims, specifications, or file history, Bristol relies on extrinsic evidence, including misleading and incomplete excerpts of deposition testimony. Examination of Bristol's conclusions further exposes the lack of support for Bristol's proposed constructions, which are based upon faulty logic and blind leaps of faith regarding the technology at issue.

For these reasons, ZymoGenetics respectfully requests that the Court adopt ZymoGenetics' claim construction.

## ARGUMENT

Claim construction begins and remains focused on the claims themselves as considered within the context of the specifications. *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (Fed. Cir. 2004) ("claim construction analysis must begin and remain centered on the claim language itself . . . .") (quotation omitted); *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("the intrinsic evidence of record, i.e.,

the patent itself, including the claims, the specification and, if in evidence, the prosecution history…is the most significant source of the legally operative meaning of disputed claim language"). Thus, the inventor's "intention, as expressed in the specification, is regarded as dispositive." *Phillips v. AWH Corp.,* 415 F.3d 1303, 1316 (Fed. Cir. 2005).

Rather than using the definitions expressly provided in the specifications of the ZymoGenetics Patents or looking to the intrinsic evidence, Bristol proposes results-driven constructions based upon tenuous conclusions drawn from unreliable, improper, or inapposite extrinsic evidence. *See Vitronics,* 90 F.3d at 1585 ("Because the specification clearly and unambiguously defined the disputed term in the claim, reliance on this extrinsic evidence was unnecessary and, hence, legally incorrect.") Thus, as explained in further detail below, the Court should reject Bristol's proposed claim constructions.

A.    **Biological Activity**[1]

The "DETAILED DESCRIPTION OF THE INVENTION" sections of each of the ZymoGenetics Patents begins with the following explicit disclosure:

> Prior to setting forth the invention, it may be helpful to an understanding thereof to set forth *definitions of certain terms to be used hereinafter*.

Sun Decl., Ex. 1 at col. 8, ll. 61-63 (emphasis added); Ex. 2 at col. 8, ll. 53-55. In this same section, the specifications go on to define the term "biological activity" as follows:

> Biological Activity
>
> A function or set of activities performed by a molecule in a biological context (i.e., in an organism or an in vitro facsimile thereof). Biological activities may include the induction of extracellular matrix secretion from responsive cell lines, the induction of hormone secretion, the induction of chemotaxis, the induction of mitogenesis, the induction of differentiation, or the

_____

[1] Bristol attempts to conflate the claim term "biological activity" with "biologically active" and "active," terms which only appear in the preamble of the claims. Because the later terms are different concepts than "biological activity," they should be analyzed separately, as set forth herein. For example, proteins can be biologically active, but the function those proteins perform is their activity. Furthermore, "biological activity" is expressly defined in the ZymoGenetics Patents, unlike "biologically active" and "active," which were added to the preamble for the express sake of clarity. *See* Sun Decl., Ex. 7 at ZG 000375.

> inhibition of cell division of responsive cells. A recombinant
> protein or peptide is considered to be biologically active if it
> exhibits one ore more biological activities of its native counterpart.

Sun Decl., Ex. 1 at col. 9, ll. 36-46; Ex. 2 at col. 9, ll. 53-63. "When a patentee defines a claim

term, the patentee's definition governs." *Honeywell Int'l, Inc. v. Univ. Avionics Sys. Corp.*, 493

F.3d 1358, 1361 (Fed. Cir. 2007) (citation omitted); *see also Phillips*, 415 F.3d at 1316 (*citing*

*CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002)) ("the inventor's

lexicography governs"). There is simply no possible way for the inventors to set forth clearer

instructions and definitions to be used for the terms in the ZymoGenetics Patents.

In contrast, without identifying any authority for doing so, Bristol proposes a construction

of the term "biological activity" that merely excises the first sentence of the definition set forth in

the ZymoGenetics Patents, and provides no explanation whatsoever for ignoring the remainder

of the definition provided in the ZymoGenetics Patents. Indeed, the scant two sentences that

Bristol devotes to its argument to support its proposed claim construction are conclusory and non

sequiturs at best, and appear to be driven by its non-infringement position. Bristol's Brief at 19-

20 (taking the position that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮).[2] Dissection of the full definition of

"biological activity" as provided by the ZymoGenetics Patents can only serve Bristol's non-

infringement position, which is improper. *See NeoMagic Corp. v. Trident Microsystems, Inc.*,

287 F.3d 1062, 1074 (Fed. Cir. 2002) ("[i]t is well settled that claims may not be construed by

reference to the accused device") (*citing SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d

1107, 1118 (Fed. Cir. 1985) (en banc)).

---

[2] A typical example of Bristol's unsupported, confusing and conclusory arguments can be found
in the four sentences that comprise Bristol's *entire* argument for this claim term. ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Bristol's Brief at 19-20. Wholly apart from the fact that
Bristol ignores that ZymoGenetics' construction is actually based on the definition explicitly
provided in its patents' specifications, Bristol presents this confusing conclusion without
explanation, such that it is unclear what Bristol is even referring to in the first place.

4

Accordingly, Bristol's proposed construction should be rejected, and the term "biological activity" afforded the complete meaning given to it in the patent specifications of the ZymoGenetics Patents. *Honeywell*, 493 F.3d at 1361.

## B.    Dimerizing Protein[3]

Like "biological activity," the term "dimerizing protein" is explicitly defined in a section of the ZymoGenetics Patents' specifications. It is worth noting again that the specifications explicitly provide the following:

> Prior to setting forth the invention, it may be helpful to an understanding thereof to set forth *definitions of certain terms to be used hereinafter*.

Sun Decl., Ex. 1 at col. 8, ll. 61-63 (emphasis added); Ex. 2 at col. 8, ll. 53-55 (emphasis added). Because "the patentee's definition governs," the proper construction of the term "dimerizing protein" *must* be the following definition provided in the ZymoGenetics Patents:

> Dimerizing Protein
>
> A polypeptide chain having affinity for a second polypeptide chain, such that the two chains associate under physiological conditions to form a dimer. The second polypeptide chain may be the same or a different chain.

Sun Decl., Ex. 1 at col. 9, ll. 31-35; Ex. 2 at col. 9, ll. 46-51; *see Honeywell*, 493 F.3d at 1361.

Bristol's proposed construction, however, uses the first sentence of the explicit definition in the ZymoGenetics Patents, deletes the second sentence, and seeks to add two unfounded limitations to this definition as follows:

> A polypeptide chain having affinity for a second polypeptide chain, such that the two chains associate under physiological conditions to form a dimer, ████████████████████

---

[3] Bristol again appears to improperly merge this claim term with "dimerizing" and "requiring dimerizing." Unlike the latter term, the term "dimerizing protein" has been given a clear definition by the ZymoGenetics Patents. "Dimerizing," "requiring dimerization" and "dimerizing protein are all different concepts. Notably, the verb "dimerize," for which Bristol presents argument in its brief, is not even a claim term. Bristol's Brief at 28. The claim term which is a noun, "dimerizing protein," is defined explicitly as a noun in the ZymoGenetics Patents' specifications. To the extent Bristol is attempting to confuse the concepts by merging them together, the Court should be aware of the distinctions and analyze "dimerizing protein" separately from "requiring dimerization."

████████████████████████████████████

Bristol's Brief at 31 (emphasis added to indicate Bristol's additional limitations).

The language of the claims of the ZymoGenetics Patents is silent as to the mechanism of dimerization. Moreover, the claims do not limit dimerization to either the "dimerizing protein" portion or the "non-immunoglobulin polypeptide" portion of the fusion protein, nor do the claims preclude involvement by the "non-immunoglobulin polypeptide" in the dimerization process, which are limitations that Bristol's proposed construction is attempting to add. In fact, the "non-immunoglobulin polypeptide" portion of the claimed fusion protein can dimerize, and in the examples disclosed in the specification, do dimerize in nature. *See e.g.* Sun Decl., Ex. 1 at col. 10, ll. 6-9) (citing nerve growth factor, colony stimulating factor-1, factor XIII, and transforming growth factor β). Thus, Bristol's proposed construction is contrary to the disclosures in the specifications of the ZymoGenetics Patents and therefore cannot be applied without violating basic principles of claim construction.

      i.    **Bristol's Additional Limitation** ██████████ **is an Improper Attempt to Read in a Limitation to the "Dimerizing Protein" Claim Element from a Preferred Embodiment.**

Bristol asserts that the term "dimerizing protein" should be construed to include the

████████████████████████████████████████

█████████████████████████████████████

███████ " Bristol's Brief at 29. Inexplicably, Bristol then concludes ██████████ ██████████████████████████ *Id.* This unsupported argument requires one to take a blind "leap of faith" regarding the technology, and entirely ignore the intrinsic evidence regarding this claim term.

"Dimerizing protein" is explicitly defined in the specifications as a noun, and Bristol's attempt to rely on grammatical constructions to bolster its results-driven and unsupported proposed constructions is not appropriate. Bristol seeks to "include elements not mentioned in the claim, in order to limit such claim," *McCarty v. Leigh Valley R.R. Co.,* 160 U.S. 110, 116

(1895), "wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim." *Hoganas AB v. Dresser Indus., Inc.,* 9 F.3d 948, 950 (Fed. Cir. 1993). Introducing a limitation to narrow the scope of that which is explicitly recited is improper. *McCarty,* 160 U.S. at 116; *Hoganas,* 9 F.3d at 950.

The specifications of the ZymoGenetics Patents do allow for the dimerizing protein to ███████████████████████████████████████████████ *See e.g.* Sun Decl., Ex. 1 at col. 13, ll. 33-34 stating the dimerizing protein "...may be used to drive the association..."). However, such a limitation may not be read into the claims. *Phillips,* 415 F.3d at 1323 ("In particular, we have expressly rejected the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment.") (citation omitted). Nevertheless, that is precisely what Bristol is asking the Court to do now. It is improper to seek to alter the claims by reading the limitation that the dimerizing protein causes or "drives" dimerization from a preferred embodiment in the specification into the claims. *Intervet Am., Inc. v. Kee-Vet Labs., Inc.,* 887 F.2d 1050, 1053 (Fed. Cir. 1989)("[T]his court has consistently adhered to the proposition that courts cannot alter what the patentee has chosen to claim as his invention, that limitations appearing in the specification will not read into claims...").

Furthermore, claim construction is not to be made "by reference to the accused device." *NeoMagic,* 287 F.3d at 1074. This limitation (as well as the second proposed limitation for this term) that Bristol seeks to add to the definition explicitly provided in the ZymoGenetics Patents is directed toward the two constituents of its accused product, CTLA4 and immunoglobulin. Specifically, the first proposed limitation -- ████████████████████████████████ ████████████████████████████████████ -- is derived from Bristol's noninfringement position that the ███████████████████████████████████ ██████████████████████████████████████████████████ ██████████ *See* Bristol's Brief at 37. Nonetheless, this type of results-driven construction is not permissible as a matter of law. *NeoMagic,* 287 F.3d at 1074.

7

**ii.    Bristol's Additional Limitation to the Term "Dimerizing Protein" ███████████ is Another Improper Results-Driven Limitation**

Bristol's proposed limitation requiring that the ███████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████ is nowhere to be found in the explicit definition of "dimerizing protein" provided in the specifications, and is yet another example of Bristol's improper results-driven proposed claim constructions. This second proposed limitation -- ████████████ ████████████████████████████████████████ -- is derived from Bristol's noninfringement position that ███████████████████████████████ ██████████████████████████████████ *See* Bristol's Brief at 37. This additional limitation is improper. *NeoMagic*, 287 F.3d at 1074. Moreover, the alleged support for this additional limitation is clearly an attempt to mislead the Court.

Bristol argues that to the extent ███████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████ Attempting to limit this claim term to a single embodiment is improper, as the Federal Circuit has been unwavering in its warning against limiting claims to those of the embodiments found within the specification. *Phillips*, 415 F.3d at 1323; *Gemstar-TV Guide Intl., Inc. v. Intl. Trade Commission*, 383 F.3d 1352, 1366 (Fed. Cir. 2004) (claims may not construed as being limited to a particular embodiment).

Moreover, what Bristol leaves out is the fact that many of the other examples provided in the ZymoGenetics Patents are non-immunoglobulins that exist as stable dimers. *See e.g.* Sun Decl., Ex. 1 at col. 11, ll. 29-49 (the insulin receptor, TGFβ, factor XIII, and CSF-1). Thus, Bristol's proposed construction improperly fails to include other applicable embodiments disclosed in the patent specifications. It is improper to read out other embodiments out of the claim when the explicit language of the claim has not been narrowed in such a manner. *Vitronics*, 90 F.3d at 1584 ("Indeed, if "solder reflow temperature" were defined to mean

liquidus temperature, a preferred (and indeed only) embodiment in the specification would not fall within the scope of the patent claim. Such an interpretation is rarely, if ever, correct…").

### iii. Bristol Relies on Extrinsic Evidence to Support Its Importation of Two Additional Improper Limitations to the "Dimerizing Protein" Term.

The cited extrinsic evidence upon which Bristol relies upon is entitled to no weight. Bristol seeks to rely on inventor and expert testimony as to the meaning of the claims. However, not only is the cited testimony tenuous at best (*e.g.*, ██████████████████████████ ██████████████████████████ ), it is based on improper questions seeking construction of claim terms (*e.g.*, ██████████████████████████ ██████████████████████████ ). Sun Decl., Ex. 9 at 220:4-5 (Deposition of Gascoigne); Ex. 10 at 114:22-25 (Deposition of Purdue). Claim construction is "exclusively within the province of the court," rather than witnesses. *Shum v. Intel Corp.,* 499 F.3d 1272, 1284 (Fed. Cir. 2007). Moreover, extrinsic evidence is considered less reliable than the patents themselves. *Phillips,* 415 F.3d at 1318 (extrinsic evidence is not part of the patent, extrinsic evidence such as expert reports and testimony are generated contemporaneously for the purpose of litigation and are difficult to evaluate). Further, expert testimony should only be used to "provide background on the technology at issue, to explain how an invention works, to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of ordinary skill in the art, or to establish that a particular term in the patent or prior art has a particular meaning in the pertinent field." *Phillips,* 415 F.3d at 1318 (*citing Pitney Bowes, Inc. v Hewlett-Packard Co.,* 182 F.3d 1298, 1308-09 (Fed. Cir. 1999)).

The ZymoGenetics Patents clearly define "dimerizing protein" -- extrinsic evidence is not required to assist the Court in this case. The Court should not consider any extrinsic testimony at odds with the "written record of the patent." *Key Pharms. v. Hercon Labs. Corp.,* 161 F.3d 709, 716 (Fed. Cir. 1998).

9

### iv.  Bristol Inappropriately Relies on the Prosecution History of a Distantly Related Patent Which Contains Different Claim Limitations



Bristol is attempting to compare apples to oranges. The claims of the ▮▮▮▮ as compared to the ZymoGenetics Patents *do not* contain the same claim limitations. *See Jonsson v. Stanley Works*, 903 F.2d 812, 817-18 (Fed. Cir. 1990)(only may utilize prosecution history from a continuation-in-part application when the same claim limitations are in issue). Bristol ignores the fundamental differences between Claim 1 of the ▮▮▮▮ and the claims of the ZymoGenetics' Patents in an attempt to improperly read limitations into the claim terms. *McCarty*, 160 U.S. at 116. Therefore, the prosecution of the '027 Patent is not relevant here.

### C.  "Ligand-Binding Domain Of A Receptor" and "ligand"

#### 1.  *"Ligand-Binding Domain"*

Again, the ZymoGenetics Patents specifically define the term "ligand-binding domain of a receptor," and accordingly, that definition must govern. *See* D.I. 156 at 13; *see also Honeywell,* 493 F.3d at 1361; *Phillips,* 415 F.3d at 1316. The ZymoGenetics Patents make clear what definitions are to be utilized: "Prior to setting forth the invention, it may be helpful to an

understanding thereof to set forth *definitions of certain terms to be used hereinafter.*" Sun Decl., Ex. 1 at col. 8, ll. 53-55 (emphasis added); Ex. 2 at col. 8, ll. 61-63 (emphasis added). The ZymoGenetics Patents state in the specification, "As used herein, the *ligand-binding domain of a receptor is that portion of the receptor that is involved with binding the natural ligand.*" Sun Decl., Ex. 1 at col. 10, ll. 10-12 (emphasis added); Ex. 2 at col. 10, ll. 31-33 (emphasis added). Therefore, the proper construction of the term "ligand-binding domain of a receptor" *must* be: "that portion of the receptor that is involved with binding the natural ligand." *Honeywell,* 493 F.3d at 1361.

In contrast, Bristol proposes adding two further limitations to this clearly set-out definition. Bristol's Brief at 39. Specifically, Bristol proposes that the term be construed to mean ██████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████ *See id.* at 38-39. The only way Bristol can do so is by attempting to equate the following three distinct claim terms to mean the same thing: ██████████ ████████████████████████████████████████████ This attempt to rewrite the claims should be rejected because these are three separate terms that appear in different places in Claim 21 and are all defined explicitly in the ZymoGenetics Patents' specification. The three definitions found in the intrinsic evidence are not the same, undermining Bristol's proposed construction.

Furthermore, Bristol's citation to extrinsic evidence, namely expert testimony, regarding the interpretation of Claim 21 is improper, as it is within the province of the Court to interpret the construe the claims. *Shum,* 499 F.3d at 1284. Indeed, Bristol's attempt to rely upon extrinsic evidence and ignore the intrinsic evidence, namely the actual language of Claim 21 and the explicit definition provided in the patent specification, is wholly unwarranted, as the patent itself

11

provides the most reliable evidence regarding construction. *Phillips*, 415 F.3d at 1318. Thus, to

the extent Bristol's proposed construction differs from the definition stated in the '725 patent

specification, it should be rejected. *See id.* at 1316; *see also CCS Fitness*, 288 F.3d at 1366.

   2.   *"ligand"*

   The ZymoGenetics Patents could not be more clear regarding how to construe the term

"ligand." Sun Decl., Ex. 1 at col. 8, ll. 53-55; Ex. 2 at col. 8, ll. 61-63.  It is explicitly defined as

follows in the patent specifications:

<div align="center">

Ligand

</div>

> A molecule capable of being bound by the ligand-binding domain
> of a receptor or by a receptor analog.  The molecule may be
> chemically synthesized or may occur in nature.  Ligands may be
> grouped into agonists and antagonists.  Agonists are those
> molecules whose binding to a receptor induces the response
> pathway within a cell.  Antagonists are those molecules whose
> binding to a receptor blocks the response pathway within a cell.

Sun Decl., Ex. 1 at col. 9, ll. 47-54; Ex. 2 at col. 9, l. 65 to col. 10, l. 6.  Bristol proposes a

construction consisting only of the first sentence of the full definition quoted above. *See*

Bristol's Brief at 40. Bristol dismisses the remainder as ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ but

provides no explanation for why that is allegedly the case.  Nor does Bristol explain why the

facts and circumstances of this case would justify a departure from the well-established law that

the definition provided in a patent must govern. *Honeywell*, 493 F.3d at 1361; *Phillips*, 415 F.3d

at 1316; *CCS Fitness*, 288 F.3d. at 1366.  Therefore, the Court should reject Bristol's proposed

construction of the term "ligand."

**D.    Receptor Analog**

   Once again, Bristol defies well settled case law that the patentee is free to define the

terms used in the claims. *See Phillips*, 415 F.3d at 1316 (*citing SciMed Life Sys., Inc. v.

Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343-44 (Fed. Cir. 2001)) ("the inventor's

intention, as expressed in the specification, is regarded as dispositive").  The ZymoGenetics

Patents leave no doubt as to the inventors' intentions, as the term "receptor analog" is explicitly

defined in the ZymoGenetics Patents as follows:

<div align="center">

12

</div>

Receptor Analog

> A non-immunoglobulin polypeptide comprising a portion of a
> receptor which is capable of binding ligand and/or is recognized by
> anti-receptor antibodies. The amino acid sequence of the receptor
> analog may contain additions, substitutions, or deletions as
> compared to the native receptor sequence. A receptor analog may
> be, for example, the ligand-binding domain of a receptor joined to
> another protein. Platelet-derived growth factor receptor (PDGF-R)
> analogs may, for example, comprise a portion of a PDGF receptor,
> capable of binding anti-PDGF receptor antibodies, PDGF, PDGF
> isoforms, PDGF analogs, or PDGF antagonists.

Sun Decl., Ex. 1 at col. 9, ll. 18-30; Ex. 2 at col. 9, ll. 31-44. Because an express definition is

provided in the specification, no further construction is necessary. *See* D.I. 156 at 15-16; *see*

*also Honeywell*, 493 F.3d at 1361.

Nevertheless, Bristol again seeks to construe this term inconsistent with the specification

based on its results-driven analysis. Bristol's proposed construction seeks to substitute its

construction for ███████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████████ *See* Bristol's Brief at 37-38. As described above in connection

with the claim term "ligand-binding domain of a receptor," this is improper. Thus, the Court

should reject Bristol's proposed construction for the term "receptor analog."

**E.    Non-Immunoglobulin Polypeptide**

The technological landscape and the history of the ZymoGenetics Patents are succinctly

described in ZymoGenetics' Opening Claim Construction Brief. *See* D.I. 156 at 3-8. In contrast,

Bristol's Claim Construction Brief contains a "Background" section that consists largely of

irrelevant -- or inaccurate -- technical information designed to overwhelm and confuse the Court.

For example, with respect to its proposed construction of the term "non-immunoglobulin

polypeptide," ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██████████████████████ *See* Bristol's Brief at 7-8. It is important, however, to be aware of the

difference. "Immunoglobulin" is commonly used by scientists, including Bristol's experts, to

13

mean antibodies. *See* D.I. 157 (Andre Declaration in Support of ZymoGenetics' Opening Claim Construction Brief ("Andre Decl."), Ex. 8 at 6, 36; Ex. 9 at ¶35; *see also* D.I. 171 at Ex. 9 (Ravetch Expert Report at ¶58); Ex. 8 (Kuriyan Rebuttal Expert Report at ¶46). In contrast, the term "immunoglobulin superfamily" refers to a loose classification of a set of molecules that share a structural component first identified by scientists in immunoglobulins, but which may or may not share functionality or other characteristics of immunoglobulins. *See* D.I. 157 (Andre Decl., Ex. 7 at BMS001054686-687). Contrary to what Bristol would have the Court believe as scientific fact, the two are not interchangeable.

The Court need not construe the term "non-immunoglobulin polypeptide," as this is a term with a plain and ordinary meaning as it is used in the context of the patent claims. ▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*See* Bristol's Brief at 6.[4]  Yet Bristol takes the absurd position that ▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at

31. Bristol would have the Court construe a term that is readily understood, ignoring the plain meaning of the term.

Specifically, a "non-immunoglobulin polypeptide" is simply a polypeptide (or protein) that is ***not an immunoglobulin***. Bristol ignores such a common sense understanding of the term, and stretches to grossly expand and confuse the meaning of "non-immunoglobulin polypeptide"

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

*See* Bristol's Brief at 32. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ There are two types of polypeptides

---

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[5] The immunoglobulin superfamily contains both immunoglobulins and non-immunoglobulins. The non-immunoglobulins in the superfamily are the ones that Bristol refers to as "immunoglobulin-like" because of this shared structural similarity.

14

relevant to the ZymoGenetics Patents: immunoglobulins and non-immunoglobulins. Bristol is attempting to concoct a ███████████████████████████████████████████ ███████████████████████████████████████████████ However, there is absolutely no scientific evidence or intrinsic evidence to support such a position with respect to ZymoGenetics' Patents. This interpretation is unwarranted by the patent claims and the intrinsic record, and is scientifically inaccurate.

1.    **The Term Immunoglobulin Has A Commonly Understood Scientific Meaning, Which Is Consistent With Its Use In The ZymoGenetics Patents**

Every party and expert involved in this case understands and agrees that the term "immunoglobulin" (commonly abbreviated as "Ig") refers to the class of antibodies produced by the immune system that includes molecules known as IgG, IgA, IgE, IgM, and IgD, which are known to scientists as "immunoglobulins." D.I. 157, Andre Decl. at Ex. 8 at 6, 36. The ZymoGenetics Patents use the term "immunoglobulin" consistently with this ordinary meaning. *See* Sun Decl., Ex. 1 at col. 13, ll. 35-48; Ex. 2 at col. 13, l. 56 to col. 14, l. 1. Indeed, even

████████████████████████████████████████████████████

████████████████████████████ D.I. 157, Andre Decl., Ex. 9 at ¶35 (stating

████████████████████████████████████████████████████

████████████████████████████ D.I. 171, Ex. 9 (Ravetch

Expert Report at ¶58, stating that ███████████████████████ Ex. 8

(Kuriyan Rebuttal Expert Report at ¶46, stating ██████████████████████████

████████████████████████████████████████ Accordingly, a "non-immunoglobulin" is any molecule that is <u>not</u> an immunoglobulin, as that term is commonly understood.

Bristol, however, ignores the understanding of the term "non-immunoglobulin" and contends that the term "non-immunoglobulin polypeptide" has no ██████████████████ ████████████████ Bristol's Brief at 31, ignoring its plain language meaning of "a polypeptide that is not an immunoglobulin," as well as the extensive references to

15

immunoglobulins in the ZymoGenetics Patents and its own experts. In fact, the specifications of the ZymoGenetics Patents discuss immunoglobulins at length, including claiming a protein fusion composed of an immunoglobulin polypeptide and a different, non-immunoglobulin polypeptide. *See, e.g.*, Sun Decl., Ex. 1, col. 13, ll. 36-57; *id.* col. 14, ll. 16-21; Ex. 2, col. 13, ll. 56-col. 14, ll. 9; *id.* col. 14, ll. 36-42. The fact that the specifications of the ZymoGenetics Patents provide detailed descriptions of the characteristics of immunoglobulins, which are contrasted in the claims to non-immunoglobulins, demonstrates that the term "non-immunoglobulin polypeptide" should be construed in light of the ordinary meaning of "immunoglobulin."

**2.      Bristol's Reliance On Extrinsic Evidence To Change The Plain And Ordinary Meaning Of "Non-immunoglobulin Polypeptide" Is Improper**

Bristol's proposed construction of the term "non-immunoglobulin" is in conflict with both the scientific community and the ZymoGenetics Patents' disclosures. Thus, Bristol has concocted a fanciful legal argument to attempt to buttress its proposed claim construction -- a construction that is clearly driven by its non-infringement position.[6] Bristol attempts to hide this infringement-analysis-driven construction by purporting to base its proposed construction of the term "non-immunoglobulin" on statements made during the ████████████████████ ████████████████████████████████ (*i.e.*, extrinsic evidence), and not on any language in the ZymoGenetics Patents themselves or in the intrinsic evidence. The Federal Circuit has made clear that extrinsic evidence is "unlikely to result in a reliable interpretation of patent claim scope unless considered in the context of the intrinsic evidence." *Phillips*, 415 F.3d at 1319. It is therefore improper for Bristol to propound a claim construction whose only conceivable basis is extrinsic to the ZymoGenetics Patents.


a. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

i. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

"[S]tatements made during prosecution of foreign counterparts to the [patents-in-suit] are *irrelevant to claim construction*...." *Pfizer, Inc. v. Ranbaxy Labs., Ltd.,* 457 F.3d 1284, 1290 (Fed. Cir. 2006) (citation omitted)(emphasis added); *see also Phillips*, 415 F.3d at 1317 (defining the "prosecution history, which we have designated as part of the 'intrinsic evidence,'" as limited to the "record of the proceedings before the [US]PTO"). Because statements made in connection with the prosecution of foreign patents are irrelevant to claim construction of United States patents, and because Bristol bases its proposed claim construction on such statements instead of on any intrinsic evidence, Bristol's proposed construction should be rejected.

Moreover, Bristol mischaracterizes the record from the foreign patent prosecution. Specifically, Bristol contends that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

17



Sun Decl., Ex. 5 at 301 (emphasis added). ZymoGenetics did not repeat this position in the

course of prosecuting the ZymoGenetics Patents in the USPTO. *See generally* Sun Decl., Exs. 7-

8 (excerpts from '726 and '026 file histories).

    Moreover, ZymoGenetics cannot be said to █████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████ While a patentee may "limit the meaning of

a claim by making a ***clear and unmistakable*** disavowal of claim scope ***during prosecution,***"

*Purdue Pharma L.P. v. Endo Pharms., Inc.,* 438 F.3d 1123, 1136 (Fed. Cir. 2006) (emphasis

added), here, the alleged disavowal did not occur during prosecution of the United States

ZymoGenetics Patents. *See generally* Sun Decl., Exs. 7-8 (excerpts from '726 and '026 file

histories). Thus, ZymoGenetics cannot be understood to have "disavowed" the full construction

of "non-immunoglobulin polypeptide" through these statements to a foreign patent office.

        ii.    ███████████████████████████████████████████████████

    Because ZymoGenetics' statements upon which Bristol now relies in support of its

proposed claim construction were ███████████████████████and were not presented to

the United States patent office, they should be accorded no weight in connection with construing

the claims of the ZymoGenetics Patents. *See TAP Pharm. Prods., Inc. v. Owl Pharms., LLC,* 419

F.3d 1346, 1350 (Fed. Cir. 2005). In *TAP Pharm.,* the Federal Circuit affirmed the district

court's claim construction, which declined to take into account statements made in the foreign

prosecution history of a related patent application:

        TAP stated to the European examiner that the invention did not
        include a polymer made from lactide or glycolide. As the district
        court explained, however, while the applicant for the European
        patent characterized the claims in that manner, ***the European***
        ***patent examiner rejected that characterization***, stating that the
        applicant "does not appear to be correct in saying that the polymer
        of the present application is different from polymerized glycolide
        and/or lactide." ***In light of the European examiner's rejection, it***

> *is reasonable to conclude that TAP receded from that*
> *characterization of its claims, which it did not repeat in the*
> *course of the prosecution of its U.S. patents. It was therefore*
> *proper for the district court to attribute little weight to the*
> *statements made to the European examiner.*

*Id.* at 1350 (emphasis added).

Very similar facts are at issue in the present case. ████████████████

████████████████████████████████████████████████████████████



Sun Decl., Ex. 5 at 301 (emphasis added). ████████████████████████

████████████████████████████████████████████████████████████

████████████████████ *Id.* Moreover, like in the *TAP* case, statements regarding the████

████████████████████████████████████████████████████████████

████████ As such, it is "proper" to accord little to no weight to the statements made during

foreign prosecution of the European related patent. *TAP*, 419 F.3d at 1350. Here, Bristol's

argument is effectively mooted by the foreign patent office's rejection of ZymoGenetics'

statements, and the Court should not be misled by Bristol's disingenuous tactics.

    iii. ████████████████████████████████████

  Beyond grounding its argument in an office action to a foreign agency that has no

relevance to the current claim construction proceeding, and despite the fact that the foreign office

in question rejected the contention████████████████████████Bristol's

argument also fails due to overreaching and illogical extrapolation. The prosecution history

cannot "enlarge, diminish, or vary" the limitations in the claims. *See Goodyear Dental Vulcanite*

*Co. v. Davis*, 102 U.S. 222, 227 (1880); *see also Intervet*, 887 F.2d at 1054. Thus, at most, the

19

prosecution history of the foreign patent history evinces a ███████████████████████████

███████████████████

Specifically, ZymoGenetics attempted to distinguish a specific piece of prior art in the

foreign prosecution, and such statements cannot constitute a "clear and unmistakable" disavowal

██████████████████████████ *See Purdue*, 438 F.3d at 1136. In trying

to overcome the prior art, which was alleged to disclose████████████████████████████

████████████████████████████████████████

Sun Decl., Ex. 6 at ZG 031859. The so-called immunoglobulin superfamily was never

mentioned.

Bristol's proposed construction of the term "non-immunoglobulin polypeptide" is thus

based on an overly broad extrapolation from statements made ███████████████████████

████████████████████ This would improperly import limitations from

a prosecution history, thereby overly constricting the meaning of "non-immunoglobulin." *See*

*Sofamore Danek Group, Inc. v. DePuy-Motch, Inc.*, 74 F.3d 1216, 1220 (Fed. Cir. 1996) (finding

that the trial court "improperly import[ed] limitations from the prosecution history and overly

constrict[ed] the meaning of [the claim term]"). As in the *Sofamore* case, ZymoGenetics was

merely distinguishing a prior art reference from the claimed invention. *Id.* That court in that

case "gave undue weight to statements during prosecution." *Id.* Bristol's argument that such

statements disclaim the entire ██████████████████are overreaching, and give far too

much undue weight to the statements made during foreign prosecution. As such, it is improper

for Bristol to ask the Court to extrapolate that████████████████████████████

████████████████████████████████████████████

████████████████████

      iv.    **The Preferred Disclosed Embodiment, PDGFR-Ig, is Read Out of the Claims Based on Bristol's Interpretation of Non- Immunoglobulin**

Not only is the broad extrapolation propounded by Bristol unfounded based on the

narrow scope of the underlying███████████████████████t would also read the

preferred embodiment out of the scope of the claims. The specification teaches numerous working examples and preferred embodiments utilizing Platelet Derived Growth Factor Receptor ("PDGFR") as a "non-immunoglobulin polypeptide." *See* D.I. 156 at 20-21. PDGFR, like CTLA4, is a member of the immunoglobulin superfamily and, in this sense, is immunoglobulin-like and shares sequence homology to immunoglobulins. Bristol's results-driven attempt to exclude ███████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ Bristol's

proposed construction should therefore be rejected because such an interpretation is "rarely, if ever, correct." *See Gentry Gallery, Inc. v. Berkline Corp.*, 134 F.3d 1473, 1477 (Fed. Cir. 1998) quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996). In this case, Bristol is basing its claim construction positions apparently on its non-infringement positions. *See NeoMagic*, 287 F.3d at 1074 (improper to base claim construction on accused device). The consequence of such a strategy is that the preferred embodiment of the ZymoGenetics Patents is read out of the scope of the claims as well. *See Gentry Gallery*, 134 F.3d at 1477. This is inconsistent with well established Federal Circuit law.

**b.     Reliance on Inventor Testimony Is Improper**

Bristol's reliance on the testimony of the inventor and of ZymoGenetics' corporate representative similarly places too much weight on extrinsic evidence without regard to the language of the ZymoGenetics Patents and the other intrinsic evidence. Extrinsic evidence "cannot be used to alter a claim construction that is dictated by a proper analysis of the intrinsic evidence." *On-Line Tech. v. Bodenseewerk Perkin-Elmer GmbH*, 386 F.3d 1133, 1139 (Fed. Cir. 2004) quoting *Intel Corp. v. VIA Techs., Inc.*, 319 F.3d 1357, 1367 (Fed. Cir. 2003) ("When an analysis of intrinsic evidence resolves any ambiguity in a disputed claim term, it is improper to rely on extrinsic evidence to contradict the meaning so ascertained"). Indeed, "an inventor is not competent to construe patent claims" because "it is not unusual for there to be a significant difference between what an inventor thinks his patented invention is and what the ultimate scope

21

of the claims is after allowance by the PTO." *Solomon v. Kimberly-Clark Corp.*, 216 F.3d 1372, 1379-80 (Fed. Cir. 2000); *see also Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996) ("The subjective intent of the inventor when he used a particular term is of little or no probative weight in determining the scope of a claim . . . ."). Rather, "the construction of a patent, including terms of art within its claim, is exclusively within the province of the court." *Shum*, 499 F.3d at 1283-84.

Moreover, the testimony upon which Bristol relies is an attempt to bolster its weak position that ZymoGenetics has somehow disavowed its claim construction through statements made in connection with prosecuting a foreign patent before a foreign patent office. For the reasons that the Court should reject Bristol's reliance on the prosecution history of the foreign patent, so too should the Court reject Bristol's reliance on this testimony.

F.    **Requiring Dimerization For Biological Activity**

Bristol is asking the Court to construe the term "requiring dimerization for biological activity" even though half of this term, "biological activity", is a claim term that has been explicitly defined in the ZymoGenetics Patents[7] and should be construed independently from this term (*see above*). Sun Decl., Ex. 1 at col. 9, ll. 36-46; Ex. 2 at col. 8, ll. 53-63. In effect, Bristol is actually only asking the Court to construe "requiring dimerization." This term does not need the Court's construction. Instead, the plain and ordinary meaning of the term should be applied. *See Phillips*, 415 F.3d at 1313 (stating that claims are construed according to their "ordinary and customary meaning"). Specifically, "requiring dimerization" means that the claimed polypeptides must be in a dimer form to exhibit biological activity. ▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮ Bristol's Brief at 28 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮

---

[7] "When a patentee defines a claim term, the patentee's definition governs." *Honeywell*, 493 F.3d at 1361; *see also Phillips*, 415 F.3d at 1316.

22

However, just as with many of its other arguments, Bristol is again attempting to read into the claims additional limitations -- *i.e.,* ▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* Bristol's proposed construction seeks to add a limitation -- ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ -- to the claim terms that is neither found in the ZymoGenetics Patents nor supported by the ordinary and customary meaning of those terms. *See Phillips,* 415 F.3d at 1313 ("[I]t is unjust to the public, as well as an invasion of the law, to construe [claim terms] in a manner different from the plain import of [the] terms."); *see also McCarty,* 160 U.S. at 116 ("[I]f we once begin to include elements not mentioned in the claim, in order to limit such claim . . . we should never know where to stop."). Accordingly, Bristol's proposed construction should be rejected. *See Johnson Worldwide Assocs., Inc. v. Zebco Corp.,* 175 F.3d 985, 990 (Fed. Cir. 1999) ("[T]here must be a textual reference in the actual language of the claim with which to associate a proffered claim construction").

**1.    Bristol's Proposed Construction Is Inconsistent With The Intrinsic Evidence**

Claims "must be construed so as to be consistent with the specification, of which they are a part." *Merck & Co. v. Teva Pharms. USA, Inc.,* 347 F.3d 1367, 1371 (Fed. Cir. 2003). Bristol argues that the term "requiring dimerization for biological activity" should be construed such that the claimed "non-immunoglobulin polypeptide" both ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Bristol's Brief at 20. ZymoGenetics recognizes that the first part of Bristol's proposed construction -- *i.e.,* ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ -- is consistent with the ordinary meaning of the term. However, Bristol improperly goes a step further and seeks to add the additional limitation that the claimed polypeptide will ▮▮▮▮▮▮▮▮▮▮▮ This limitation is not found in the claims or specifications of the ZymoGenetics Patents or otherwise in the intrinsic evidence. In fact, Bristol's proposed limitation that the non-immunoglobulin claimed ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮ directly conflicts with the specifications of the ZymoGenetics Patents and must therefore be rejected.

23

In particular, the specifications of the ZymoGenetics Patents explicitly describe several examples of polypeptides that "require dimerization for biological activity" and exist in nature as dimers:

> Polypeptides requiring dimerization for biological activity include, in addition to certain receptors, nerve growth factor, colony-stimulating factor-1 (CFS-1), transforming growth factor β (TGF-β), PDGF, and factor XIII. Nerve growth factor *is a non-covalently linked dimer*. CSF-1, which specifically stimulates the proliferation and differentiation of cells of mononuclear phagocytic lineage, *is a disulfide-bonded homodimer*. TGF- β is biologically active as a disulfide-bonded dimer. Factor XIII is a plasma protein that *exists as a two chain homodimer* in activated form. PGDF, as noted above, *is a disulfide-bonded two chain molecule*.

Sun Decl., Ex. 1 at col. 11, ll. 33-48 (citations omitted)(emphasis added); Ex. 2 at col. 11, l. 54 to col. 12, l. 2 (citations omitted)(emphasis added). These embodiments of the polypeptides that can be used with the claimed inventions require that the claims of the ZymoGenetics Patents cover non-immunoglobulin polypeptides that will dimerize on their own. Thus, the ZymoGenetics Patents do not limit the claimed invention to those non-immunoglobulin polypeptides that ▬▬▬▬▬▬▬▬▬▬ *Id.*, Ex. 1 at col. 12, l. 39; Ex. 2 at col. 12, ll. 59-60 (stating that all of these polypeptides "may . . . be used within the present invention.").

### 2.    Bristol's Prosecution Disclaimer Argument is Inapposite

Bristol relies on the prosecution history of a related patent, the '027 Patent, in an attempt to construe the "requiring dimerization" portion of the disputed claim language.[8] The plain meaning of "require" and of "dimerization" is clear, and Bristol's convoluted analysis of a related patent's prosecution again defies common sense. The '027 Patent claims dimeric recombinant molecules, (Sun Decl., Ex. 4), whereas the relevant claim elements of the ZymoGenetics Patents relates to native polypeptides. *See e.g.* Sun Decl., Ex. 1 at col. 1, ll. 27-50; Ex. 2 at col. 1, l. 27 to col. 2, l. 11. Bristol is comparing apples to oranges and ignoring fundamental differences among the Patent claims in an attempt to read limitations into the claim

---

[8] Bristol is again conflating the claim terms. The claim term "requiring dimerization for biological activity" is distinct from "dimerizing protein."

terms. ZymoGenetics never "disavowed" non-immunoglobulin polypeptides ▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮ Bristol's Brief at 27. Quite the opposite, the ZymoGenetics Patents
specifically covers and refers to non-immunoglobulins that exist as dimers on their own.
Bristol's argument simply does not follow from the prosecution history it cites.

   Bristol's incorrect contentions that ZymoGenetics ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Bristol's Brief at 24) is misplaced at best, as it is based on
the prosecution of a distantly related ancestor patent to the ZymoGenetics Patents in which
different claim limitations were at issue.[9] Prosecution disclaimer may "attach[] to progeny
continuation in part applications," but only *where the same claim limitation is at issue*."
*Omega Eng'g, Inc. v. Raytek Corp.,* 334 F.3d 1314, 1335 (Fed. Cir. 2003) (emphasis
added)(citations omitted). Thus, as a threshold matter, any alleged prosecution disclaimer from
the ancestor patent would not apply to the ZymoGenetics Patents because different claim
limitations were at issue. *Compare* Sun Decl., Ex. 4 at col. 42, ll. 9-10 (the '027 Patent claim
limitation at issue was a "non-immunoglobulin polypeptide *dimer* requiring dimerization for
biological activity")(emphasis added) *with* Sun Decl., Ex. 1, Reexamination Certificate at col. 1,
ll. 33-34 (the '725 Patent reciting a "non-immunoglobulin polypeptide requiring dimerization for
biological activity," without limiting the non-immunoglobulin polypeptide to dimeric
polypeptides). Thus, it is clear from a plain reading of the claims that the claim limitations at
issue in this case are not the same. The prosecution history of the '027 Patent is not relevant.

---

[9] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ The '027 patent is a distantly related ancestor of
the ZymoGenetics Patents, as reflected on the face of the ZymoGenetics Patents:

   Division of application No. 08/477,329, filed on Jun. 7, 1995, now
   Pat. No. 5,750,375, which is a continuation of application No.
   08/180,195, filed on Jan. 11, 1994, now Pat No. 5,567,584, which
   is a continuation of application No. 07/634,510, filed on Dec. 27,
   1990, now abandoned, which is a continuation-in-part of
   application No. 07/347,291, filed on May 2, 1989, now [the '027
   patent], filed on Jan. 22, 1988, now abandoned.

Sun Decl., Ex. 1; Ex. 2.

### 3. The Inventor and Expert Testimony Cited by Bristol Constitutes Unreliable Extrinsic Evidence

The inventor and expert testimony cited by Bristol should not inform the Court's claim construction. Bristol's Brief at 23-24. In general, the utility of extrinsic evidence in claim interpretation is minimal, at best. *See Phillips*, 415 F.3d at 1318-19 . Where, as here, the cited extrinsic evidence is inconsistent, and even in direct conflict, with the intrinsic evidence, its value is nil. *See Vitronics*, 90 F.3d at 1585 ("Because the specification clearly and unambiguously defined the disputed term in the claim, reliance on this extrinsic evidence was unnecessary and, hence, legally incorrect").

In particular, Bristol seeks to rely upon testimony from one of the named inventors. However, "an inventor is not competent to construe patent claims" because "it is not unusual for there to be a significant difference between what an inventor thinks his patented invention is and what the ultimate scope of the claims is after allowance by the PTO." *Solomon*, 216 F.3d at 1379-80; *see also Markman*, 52 F.3d at 979 ("The subjective intent of the inventor when he used a particular term is of little or no probative weight in determining the scope of a claim . . . "). Furthermore, the testimony cited by Bristol does not support the proposition that the

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████ Sun Decl., Ex. 3 (Deposition of

Andrzej Sledziewski at 248:1-2 and 249:3-6 ████████████████████████████

██████████████████████

Similarly, expert testimony that contradicts the intrinsic evidence is not entitled to any weight, and expert testimony standing alone cannot form the basis for claim construction. *See Phillips*, 415 F.3d at 1318 ("conclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court"). Here, although taken out of context, the expert testimony upon which Bristol relies, *see* Bristol's Brief at 28, amounts at most to conclusory and

unsupported assertions as to claim construction, and therefore cannot form the basis for construing the claim term.

### G.     "Biologically Active"/ "Active"

The terms "biologically active" and "active" do not require construction because they appear in the preambles of the ZymoGenetics Patents and are nonlimiting. *See Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1346 (Fed. Cir. 2002) ("[g]enerally, the preamble does not limit the claims") (citation omitted). In general, a preamble may limit the claim if "it recites essential structure or steps, or if it is necessary to give 'life, meaning, and vitality' to the claim." *Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808-09 (Fed. Cir. 2002); *see also Computer Docking Station Corp. v. Dell, Inc.*, 519 F.3d 1366, 1375 (Fed. Cir. 2008) ("clearly recite[s] a necessary and defining aspect of the invention"). However, if the body of the claim "describes a structurally complete invention such that deletion of the preamble phrase does not affect the structure or steps of the claimed invention" then the preamble is generally not limiting. *Catalina Mktg.*, 289 F.3d at 808-09. In this case, the claims fully support the structure and steps of the claimed invention. *See generally* Sun Decl., Ex. 1; Ex. 2. Removal of the preamble does not affect anything. The preambles of the claims do not recite any "additional structure or steps underscored as important by the specification." *Catalina Mktg,* 289 F.3d at 808.

In addition, a preamble that merely describes the "purpose or intended use of the invention" does not limit the claims. *Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 952 (Fed. Cir. 2006); *see also Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1350 (Fed. Cir. 1998) (where preamble simply stated intended use or purpose of the invention, and did not limit the scope of the claims). Moreover, a preamble is not a necessary aspect of the invention where the body of the the claim recites the complete invention, and does not refer back to the preamble. *Bicon,* 441 F.3d at 952. Here, the terms "biologically active" and "active" do not limit the relevant claims because these terms merely state that the "purpose or intended use" of each invention is a polypeptide that is biologically active. Thus, these terms do not clearly recite a necessary and

27

defining aspect of the invention beyond what it elsewhere described in the specifications and the patent claims. *See, e.g.,* Sun Decl., Ex. 1 at col. 9, ll. 35-45; Ex. 2 at col. 9, ll. 53-63.

   Bristol nevertheless argues ███████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████ Bristol's Brief at 19.. However, the term "biological activity" itself appears in the claim language and is explicitly defined in the specifications. Sun Decl., Ex. 1 at col. 9, ll. 36-45; Ex. 2 at col. 9, ll. 52-63. Thus, even under Bristol's argument, the presence of the terms "biologically active" and "active" is at best redundant and is certainly not necessary or defining of the invention. Accordingly, the preambles of the ZymoGenetics Patents should not limit the scope of the claims in this case and the terms "biologically active" and "active" in the preambles need not be construed.

## CONCLUSION

   For the foregoing reasons, ZymoGenetics respectfully requests that the Court decline to adopt Bristol's proposed constructions and adopt ZymoGenetics' proposed constructions for the claim terms at issue in this case.

               POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Paul J. Andre          By: /s/ Philip A. Rovner
Lisa Kobialka            Philip A. Rovner (#3215)
King & Spalding LLP        Hercules Plaza
1000 Bridge Parkway        P. O. Box 951
Ste 100             Wilmington, DE 19899
Redwood Shores, California     (302) 984-6000
(650) 590-0700         provner@potteranderson.com

Dated: June 23, 2008       *Attorneys for Plaintiff*
871112            *ZymoGenetics, Inc.*

---

[10] If the Court agrees with Bristol and determines these terms are limitations in need of construction, ZymoGenetics does not dispute Bristol's proposed construction that ████████████
████████████████████████████████████████████████████████████████████

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

### CERTIFICATE OF SERVICE

I, Philip A. Rovner, hereby certify that on June 30, 2008, the within document

was filed with the Clerk of the Court using CM/ECF which will send notification of such

filing(s) to the following; that the document was served on the following counsel as indicated;

and that the document is available for viewing and downloading from CM/ECF.

### BY HAND DELIVERY AND E-MAIL

Frederick L. Cottrell, III, Esq.
Kelly E. Farnan, Esq.
Richard Layton & Finger, P.A.
One Rodney Square
P. O. Box 551
Wilmington, DE  19899
cottrell@rlf.com
farnan@rlf.com

I hereby certify that on June 30, 2008 I have sent by E-mail the foregoing

document to the following non-registered participant:

Christopher P. Borello, Esq.
Colleen Tracy, Esq.
Fitzpatrick Cella Harper & Scinto
30 Rockefeller Plaza
New York, NY  10112
cborello@fchs.com
ctracy@fchs.com

/s/ Philip A. Rovner
Philip A. Rovner  (#3215)
Potter Anderson & Corroon LLP
Hercules Plaza
P. O. Box 951
Wilmington, DE 19899
(302) 984-6000
provner@potteranderson.com

748348